[No. S030644. Apr. 25, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
RICARDO ROLDAN, Defendant and Appellant.

658

Counsel

Timothy J. Foley, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon, John R. Gorey and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**WERDEGAR, J.**—Ricardo Roldan was convicted in 1992 in Los Angeles County Superior Court of the first degree murder of Roland Teal (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated) and the robbery and attempted murder of Barney Pipkin (§§ 211, 664, 187). The jury found true a special circumstance allegation that defendant murdered Teal while engaged in committing a robbery (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A)) and also sustained three lesser enhancement allegations (§§ 12022.5, subd. (a) [personal use of a firearm], 12022, subd. (a)(1) [participation in a felony in which a principal was armed with a firearm], 12022.1 [on-bail enhancement]). On October 26, 1992, the jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).)

After considering the claims raised on appeal, we affirm the judgment in its entirety.

## I. Guilt Phase

### A. *Facts*

In 1990, defendant was free on bail while being prosecuted on charges he had participated in a robbery at the Sun Valley swap meet. On June 3 of that year, a different swap meet in San Fernando closed at the usual time of 3:00 p.m. Manager Barney Pipkin followed his usual procedure, collecting the receipts from the two ticket booths and then returning to the reservation office to count the day's receipts with assistant manager Judy Adams. Leticia Calderon and Maria Murillo also worked in the office. On this day, the receipts were more than $12,000, mostly in cash, which Pipkin and Adams bundled and placed into seven bags bound together at the top with rubber bands.

Pipkin, with Adams's help, then began loading his car trunk with various items, saving the bags of money for last, as was his custom. As Adams handed him the bags to load into the car, someone said: "Don't fucking move." Adams turned and observed a young Latino male in a long coat, although it was over 100 degrees that day. He had a gun, somewhat obscured by his coat. Adams turned to run, but the gunman pointed the gun at her and repeated: "I said don't anybody fucking move." Calderon and Murillo heard this second command. Calderon heard a clicking metal-on-metal sound, as if the gunman had pulled the trigger but the gun had misfired. Calderon and Murillo identified defendant as the gunman.

A second young Latino man, later determined to be 17-year-old Sergio Ayala, approached Pipkin and wrestled the bags of money from him. The two robbers then fled on foot. Pipkin and Calderon shouted that they had been robbed, while Adams returned to the office and called the police. Pipkin got into his car and attempted to follow the robbers. Both Pipkin and Calderon noticed a white Camaro parked in a driveway nearby.

Juan Jimenez was working at the swap meet as a security guard when he heard Calderon yelling. He saw the robber (Ayala) with the bags and gave chase, but the white car, driven by a third robber later identified as Richard Zorns, moved back and forth, blocking his path. Jimenez continued his pursuit, along with Roland "Lucky" Teal, his stepson Dominic Wright, and Ricardo Mireles, all swap meet employees. Teal eventually grabbed the fleeing robber, and Jimenez, Wright, and Mireles arrived to help detain him.

The gunman, whom Jimenez later identified as defendant, reappeared and shouted: "Let my friend[] go or I'm going to start shooting." People scattered, but Teal simply released the robber, put his hands up, and froze, looking at the gunman. Defendant fired several shots in succession, as if from a machine gun, striking Teal in the chest and arm. Teal later died in the hospital of his wounds.

As the robbers prepared to make their getaway in the white car, Pipkin arrived in his car. Defendant, who was standing in the street near the white car, pointed a gun at Pipkin's car. Pipkin heard a "ping" sound and retreated. Police found a bullet hole in Pipkin's windshield and a corresponding bullet hole in the car seat, at chest level, two inches from where Pipkin had been sitting. A second bullet struck the roof of Pipkin's car. Pipkin provided police with what he believed was the license plate number of the white Camaro: 1 BSX 567.

Christine Zorns (hereafter sometimes Christine) owned a white Pontiac Firebird, license No. 2 BSX 544. Her boyfriend at the time was Richard Zorns.[1] Richard Zorns often drove the car. On the day of the crime, Christine returned to their home in the early afternoon to find both Zorns and her car were gone. She received a telephone call from Zorns later that day, asking her to join him at his mother's house. Several people were present when she arrived, including Zorns, Ayala, and defendant. They were watching television, drinking, and laughing. They appeared to be discussing the details of the crime. For example, Christine overheard someone say that Ayala had been caught and that someone else had said to release him or he would "bump" him, meaning shoot him. Christine noticed defendant had a briefcase with a lot of money in it; Zorns and Ayala also had bags filled with money. Zorns's bag had $4,000.

Jude Barrios was defendant's girlfriend and the mother of his two children. They lived with his mother. Barrios testified that defendant often spoke to her of robbing the San Fernando swap meet. He also had discussed it with Zorns and Ayala. In the late afternoon on the day of the crime, she called defendant at Zorns's mother's house. Defendant sounded "ecstatic," "on cloud nine." She drove to the house and picked him up; he told her he had robbed the swap meet. The next day, they went to the courthouse together to await the jury verdict in the Sun Valley swap meet robbery case. While there, he again confessed to her that he had robbed the San Fernando swap meet and, reading a press account of Teal's killing, told Barrios the newspaper article had incorrect details. Later, he told her a "huge" Black security guard held Ayala and that he had shot the guard "because he was the only one who could identify him." That evening, Richard Zorns and Sergio Ayala came over to visit defendant; Barrios overheard them laughing and joking about the crime.

Police arrested defendant the next day. He called Barrios from jail and told her where he had hidden his share of the money stolen from Pipkin. She found a briefcase with more than $3,000 and, as instructed, gave some money to defendant's mother and spent the rest. She admitted she had lied for defendant in his earlier robbery trial. She also admitted the prosecution had granted her immunity in the present case and that defendant had told her if she testified against him he would not hurt her, but would hurt someone in her family.

Defendant was convicted in the earlier Sun Valley robbery case. Zorns and Ayala were tried separately and convicted of robbery and murder for their roles in the crimes at the San Fernando swap meet. The defense in the instant case rested without calling any witnesses.

---

[1] They had married by the time of defendant's trial, and she gave her name as Christine Zorns.

B. *Pretrial Issues*

1. *Denial of a Continuance*

Defendant first contends the trial court's denial of his request for a continuance, made approximately two weeks before the scheduled start of the trial, violated his federal and state constitutional rights to effective assistance of counsel, to a fair trial, to confront and cross-examine the witnesses against him, to due process of law, and to a reliable capital sentencing determination. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, 17.) As we explain, although the denial of a continuance can, under some circumstances, deprive a criminal defendant of these important constitutional rights, the circumstances in this case fail to rise to that level. The trial court, therefore, did not abuse its broad discretion by denying the continuance.

a. *Facts*

Trial Attorney Richard Gomez-Hernandez[2] was appointed to represent defendant on April 11, 1991, and appeared in court for defendant's arraignment on that day. The proceedings were put over several times, often at the request of counsel. On November 8, 1991, counsel stated he would "probably" be ready to proceed in 45 days. When, on January 9, 1992, scheduling problems developed due to the court's previous decision to try defendant jointly with Zorns and Ayala, the court granted Zorns and Ayala's motion to sever their cases from defendant's case.

On March 6, 1992, defense counsel explained that he was engaged representing a defendant in a different capital trial, *People v. Carrion*, that would take at least 45 days, excluding a possible penalty phase trial. He asked the trial court not to schedule defendant's case to begin until "at least a month" after the end of the *Carrion* case. The trial court agreed. Back in court on April 24, 1992, counsel explained that he was engaged in plea negotiations with the prosecutor in defendant's case and hoped to reach a mutually agreeable plea agreement as a result of those negotiations. Both sides agreed to a continuance to May 22. At a status conference on May 21, 1992, the trial court announced that, barring a plea, it expected the matter to go to trial and asked the parties whether July 28 was a viable trial date. When both sides agreed, the trial court set the matter as a "must go" for July 28, 1992.

---

[2] Gomez-Hernandez was generally referred to at trial as "Mr. Gomez," although he referred to himself as "Richard Gomez-H."

The parties were back in court for a status conference on June 30, 1992. The court reminded the parties that it considered the case a "must go." Defense counsel explained that the plea negotiations had been unsuccessful and that the district attorney's office refused to accept any plea that did not include the death penalty. When counsel communicated that information to defendant, "it was a very, very emotional time for Mr. Roldan. [¶] I continued to speak with him for approximately a half-hour after I informed him of that fact and Mr. Roldan did not speak any sentences that were coherent to me." Counsel also stated he had spoken to defendant on June 25 and he was similarly incoherent. Counsel then declared he had a doubt as to defendant's competence and requested appointment of a psychiatrist pursuant to section 1368. The trial court stated it did not doubt defendant's competence, but offered to appoint a psychiatrist to examine defendant and to render a report to counsel concerning defendant's mental state. Counsel accepted this offer and acquiesced to setting a status conference for July 13.

By the time the parties met in court on July 13, 1992, Dr. Michael Maloney, a clinical psychologist, had twice interviewed defendant. In an in camera hearing, the prosecutor opined that Dr. Maloney was preparing a report that would conclude that defendant was competent to stand trial. In addition, Dr. Maloney had informed the prosecutor that in order to avoid trial, defendant had said he planned to kill the prosecutor. (See *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334].) Defense counsel confirmed the prosecutor's story.

Back in court on July 20, 1992, defense counsel indicated he would not be ready to proceed on July 28, the intended trial date. The court reminded counsel that jurors had already been ordered for "August 4th, day seven of ten."[3] Counsel asked the trial court to set a status conference for July 23, saying: "If I were asked at this point whether or not I would be ready to proceed within the near future, I would say yes, I would be ready to proceed in the near future, but the near future is not a trial date on August 4th." The court replied: "I made this a must go basis. I need a little more." Counsel stated he was "prepared to make the necessary statements for the court," but asked to do so at a status conference on July 23. With counsel's acquiescence, the court set a status conference for July 22, but added: "Just so you are aware, when I say 'no further continuances,' I do it rarely because when I do it, I mean it."

---

[3] The People had up to 10 days to try defendant, beginning July 28, 1992. "[A]n action shall not be dismissed under this paragraph if either of the following circumstances exist: [¶] . . . [¶] (B) The defendant requests or consents to the setting of a trial date beyond the 60-day period. Whenever a case is set for trial beyond the 60-day period by request or consent, expressed or implied, of the defendant without a general waiver, *the defendant shall be brought to trial on the date set for trial or within 10 days thereafter.*" (§ 1382, subd. (a)(2), italics added.)

On July 22, 1992, defense counsel moved for a continuance. Neither the prosecutor nor defendant was present. Counsel explained that when he told defendant the prosecution intended to seek the death penalty and would not accept a plea to a lesser charge, "I could see an immediate and substantial impairment on my ability to represent him to the effect that Mr. Roldan became entirely silent. I could see that he was extremely angry and upset. I assume that that was just as a result of me bringing him the news [that a plea to less than the death penalty would not be accepted]. [¶] Since the time of [that] decision, I had seen Mr. Roldan about 14 or 15 different times. On each of those occasions he has refused to speak with me. I have attempted to elicit the help of family members. I don't find his family members to be particularly helpful with regard to establishing lines of communication." In addition, defense counsel revealed that he too had received a *Tarasoff* warning from Dr. Maloney and considered the threat to be real. He indicated he had taken precautions to protect his wife and children.

Defense counsel considered declaring a conflict and asking the court to appoint someone else to represent defendant but concluded he could not "in good conscience ask somebody else to take responsibility and put themselves in a position like mine." He averred: "I believe in my heart that Mr. Roldan is extremely distraught at this time. I also firmly believe that I will be able to work through this situation and provide him effective assistance of counsel. I don't see that happening by August the 4th. [¶] I am not asking you to relieve me at this time because I believe that I would have the best opportunity to manage this case until its completion. I don't want somebody else to be put in this situation, and I do not believe that my effectiveness would be overshadowed by this particular event."

The trial court denied the request for a continuance. Citing *People v. Hardy* (1992) 2 Cal.4th 86 [5 Cal.Rptr.2d 796, 825 P.2d 781], the court found "that defendant is merely trying to manufacture a possible conflict of interest. I can foresee that in this case he is trying to manufacture a possible delay." (See *id.* at p. 138.) "[I]f it were not for you, . . . it would be against attorney X, or attorney Y, or attorney Z, and that if not now, then the next trial date and the next one." Defense counsel "implore[d]" the court to reconsider, seeking time to repair his relationship with defendant. He noted that defendant's brother was capable of carrying out the threat. Counsel sought 45 additional days, claiming that the denial of a continuance compromised him "beyond effectiveness." Claiming that the threat to his life "is going to play on my mind night and day," counsel claimed: "I cannot, I am not objective at the present time. And if I am not objective, how effective can I really be for Mr. Roldan?" The trial court asked counsel: "What assurance can you give

me, if any, that in 45 days this threat will not be as serious?" Counsel replied that he "will do everything in my power to establish my relationship with Mr. Roldan. I can tell you, Judge, that I will devote literally all of my time to getting Mr. Roldan to cooperate. That's the only way that I can ameliorate a threat."

Later, defense counsel stated: "Can I provide Mr. Roldan with effective assistance of counsel? Yes, I believe I can provide him with effective assistance of counsel if I am given this additional time. Otherwise, I am left to only one, to one subject, which is [to] declare a conflict right now because, subjectively, I am not in the frame of mind to be able to say that nothing else would impair my ability to represent him. I believe this to be a real threat. [¶] I cannot say that nothing would affect my ability to represent Mr. Roldan, but I can assure you, sir, that if I was given this additional time, I believe that I can get Mr. Roldan to cooperate with me and I believe that the threat that has been articulated by the psychologist to both [the prosecutor] and myself would be minimized."

The trial court declined to reconsider its previous denial of a continuance, explaining: "I have to tell you that based upon what you told me, it appears that you do agree that your client is subject to manufacturing his own reasons for either a conflict, apparent conflict or delay. I am not . . . convinced that in 45 days the matter will be assuaged or that is such to be put to rest." "I accept what you are saying that you are acting in good faith, and I am not questioning your integrity at all. I feel your client is trying to manufacture a delay, that's all."[4]

Defense counsel immediately challenged the trial court's denial of a continuance, unsuccessfully seeking a pretrial writ of mandate or prohibition and a stay of trial from the Court of Appeal. (*Roldan v. Superior Court*, July 28, 1992, B068672.) On August 7, 1992, this court stayed the trial, which was then in jury selection, but ultimately denied relief. (*Roldan v. Superior Court*, Aug. 20, 1992, S027967.) Counsel renewed his request for a continuance several more times during this period, but the trial court denied the request each time. Jury selection eventually resumed, and opening statements finally commenced on September 1, 1992, approximately 40 days after the trial court had denied a continuance on July 22.

---

[4] Although not before the trial court when it ruled on the motion for a continuance, it turned out the court's intuition was correct. At the penalty phase, defendant testified that he thought he would obtain a postponement of his trial if he told Dr. Maloney he wanted to gouge the prosecutor's eyes out.

b. *Discussion*

■ A "trial court has broad discretion to determine whether good cause exists to grant a continuance of the trial. (§ 1050, subd. (e) . . . .) A showing of good cause requires a demonstration that counsel and the defendant have prepared for trial with due diligence." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) Such discretion "may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." (*People v. Sakarias* (2000) 22 Cal.4th 596, 646 [94 Cal.Rptr.2d 17, 995 P.2d 152].) "To effectuate the constitutional rights to counsel and to due process of law, an accused must . . . have a reasonable opportunity to prepare a defense and respond to the charges." (*People v. Bishop* (1996) 44 Cal.App.4th 220, 231 [51 Cal.Rptr.2d 629].)

■ Applying that law here, we find the trial court did not abuse its broad discretion when it denied defendant's July 22 request for a continuance as well as the renewed requests made in the remaining pretrial period. At the time of the July 22 request, defense counsel had represented defendant for more than 15 months.[5] The trial court had set a July 28 trial date and had given counsel two months' notice of it, saying the case was a "must go." In an abundance of caution, the court accommodated counsel by appointing a mental health expert to examine defendant before trial, although the court expressly stated it did not doubt his competence to stand trial. Counsel's reasons for seeking a delay included defendant's refusal to cooperate with him and his threats against him. It is settled law, however, that the denial of a request for a continuance, when such request is premised on an accused's persistent failure to cooperate with counsel and his deliberate refusal to assist counsel, is not arbitrary. (*People v. Jenkins, supra,* 22 Cal.4th at pp. 1037–1038; *People v. Grant* (1988) 45 Cal.3d 829, 844 [248 Cal.Rptr. 444, 755 P.2d 894].)

Although counsel's self-proclaimed inability to provide effective assistance without a continuance is a cause for concern, counsel did not seek to withdraw at that time. Nor could counsel explain why an additional 45-day delay would improve the situation to a point where defendant would cease issuing threats of violence against him and would instead begin cooperating with him. Given the long period of time the case had been pending, the trial court justifiably was concerned that defendant would threaten any subsequent lawyer and thereby attempt to delay his trial indefinitely. The trial court

---

[5] Accordingly, we reject defendant's claim that there was an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" (*Morris v. Slappy* (1983) 461 U.S. 1, 11–12 [75 L.Ed.2d 610, 103 S.Ct. 1610].)

expressed this very sentiment, saying: "if it were not for you, . . . it would be against attorney X, or attorney Y, or attorney Z, and that if not now, then the next trial date and the next one." Under the circumstances, the trial court did not abuse its discretion in concluding that counsel had had a fair opportunity to prepare for trial and that defendant was merely attempting to manufacture delay.

Although neither party cites any legal authority involving an accused's attempt to delay trial by threatening his lawyer with violence, no authority is necessary. That the administration of justice would suffer if one accused of a serious crime could postpone his trial indefinitely merely by issuing a series of threats to his court-appointed attorney is obvious. Although we sympathize with defense counsel (and the prosecutor), who were required to work under such stressful conditions, we depend on our trial judges to discern whether such threats are genuine or not, whether such threats have rendered trial counsel unable to continue, and whether granting a continuance would ameliorate the situation. The trial court here acted well within its wide discretion in ruling that defendant's threat to counsel was merely an attempt to delay the trial further.

Finding the trial court did not abuse its discretion by denying a continuance, we also reject defendant's further claims that the court's ruling violated various of his constitutional rights. Assuming without deciding these claims were preserved for appellate review despite defendant's failure to make timely and specific objections on constitutional grounds (*People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93]), our conclusion the trial court acted within its broad discretion in denying a continuance forecloses a constitutional challenge (*People v. Jenkins, supra,* 22 Cal.4th at pp. 1039–1040).

### 2. *Alleged Conflict of Counsel*

Defendant next contends he is entitled to reversal of his judgment of conviction because defense counsel labored under a conflict of interest stemming from defendant's threats against counsel's life.

#### a. *Facts*

As explained, *ante,* defense counsel requested a continuance on July 22, 1992. At that same hearing, he expressly declared that he was not asking to be relieved. "I don't want somebody else to be put in this situation, and I do not believe that my effectiveness would be overshadowed by this particular event." Later at the same hearing, counsel stated: "I believe I can provide

[defendant] with effective assistance of counsel if I am given this additional time. Otherwise, I am left to only one, to one subject, *which is [to] declare a conflict right now* because, subjectively, I am not in the frame of mind to be able to say that nothing else would impair my ability to represent him. I believe this to be a real threat. [¶] . . . I am not asking you to appoint another lawyer and for me to get off the case, because my conscience and my moral dictates won't allow me to subject somebody else rather than myself." (Italics added.) Later at the same hearing, he averred: "I cannot be, I cannot provide him effective assistance of counsel right now. *I want to remain being Mr. Roldan's lawyer because I believe that the threat would be lessened to me.*" (Italics added.) The court denied the request for a continuance.

Back in court on August 20, 1992, following this court's denial of writ relief and dissolution of a previously ordered stay of trial, defense counsel renewed both his motion for a continuance and his claim of a conflict of interest: "I believe there exists the potential, not the potential, I should say there exists a conflict between Mr. Roldan and myself, which would materially and irreparably affect the attorney-client privilege [*sic*: relationship?]." In response to the trial court's questions, counsel affirmed that he was declaring a conflict for the same reasons he explained in camera on July 22, that is, defendant's threat to kill him. The trial court then ruled: "The reasons you stated before were insufficient then, they are insufficient now. The fact that you are now inferring a conflict of interest, when you chose specifically to deny that before, does not dissuade me. I am not saying this is a last minute ploy to inject error into this case. I do not accept this as a conflict of interest, and the motion is denied."

The guilt phase portion of the trial began with the prosecutor's opening statement on September 1, 1992. As noted in more detail, *post*, defendant thereafter twice moved to have his attorney relieved as appointed counsel, once on September 3 and again on September 15. Both motions were denied.

Defense counsel raised the conflict issue again on September 16, 1992. Noting in camera that a second mental health expert, Dr. Ronald Siegel, had reported that defendant again threatened defense counsel's life, counsel stated: "Your honor, I don't know of any way that I can effectively represent Mr. Roldan if, in fact, . . . there [are] threats against my life pending over my head. But at any time that I endeavor to secure the assistance of others in order to provide Mr. Roldan with effective assistance of counsel, those people are told literally that Mr. Roldan does not want to cooperate and that the threats that I have indicated [have been] made. [¶] I feel that there is such a conflict, such a breakdown in the attorney-client relationship, that at this point I am left with no other choice but to declare a conflict. I believe that the court is well aware of this problem. Its genesis began with statements to

Dr. Maloney." Then: "I don't believe I can exercise my independent judgment as to what can and cannot be done and what should and should not be done if I have these threats over my head."

After listening to counsel explain himself, the trial court denied the motion: "I can tell you at this time that there is nothing in the record to reflect the breakdown of the attorney-client relationship of the magnitude to jeopardize the defendant's right to effective assistance of counsel. [¶] You are doing an exemplary job. You are making those points that you are seeking to make. Your client, and I mentioned this before, may be seeking to run this trial, as he stated himself, in such a way that he either wants a mistrial or should try to inject error into this proceeding. [¶] Your client yesterday stated during the *Marsden*[6] hearing that he wants to get to the penalty phase as quickly as possible. You are doing your ethical duty to see that that is not so. [¶] The motion to be relieved, if that's what it is, is denied for the reasons I have stated."

### b. *Discussion*

■ "The right to effective assistance of counsel, secured by the Sixth Amendment to the federal Constitution, and article I, section 15 of the California Constitution, includes the right to representation that is free from conflicts of interest." (*People v. Cox* (2003) 30 Cal.4th 916, 948 [135 Cal.Rptr.2d 272, 70 P.3d 277].) " 'Conflicts of interest may arise in various factual settings. Broadly, they "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person *or by his own interests.*" ' " (*People v. Hardy*, *supra*, 2 Cal.4th at p. 135.)

■ Under the federal Constitution, when counsel suffers from an actual conflict of interest, prejudice is presumed. (*Cuyler v. Sullivan* (1980) 446 U.S. 335 [64 L.Ed.2d 333, 100 S.Ct. 1708].) This presumption arises, however, "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 692 [80 L.Ed.2d 674, 104 S.Ct. 2052], citing *Cuyler v. Sullivan*, *supra*, at p. 348.) An actual conflict of interest means "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." (*Mickens v. Taylor* (2002) 535 U.S. 162, 171 [152 L.Ed.2d 291, 122 S.Ct. 1237], italics omitted.) "Under the Sixth Amendment of the federal Constitution, reversal is required if a defendant, over a timely objection, is forced to continue with conflicted counsel." (*People v. Dancer* (1996) 45 Cal.App.4th

---

[6] *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*).

1677, 1685 [53 Cal.Rptr.2d 282], overruled on other grounds in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123 [65 Cal.Rptr.2d 1, 938 P.2d 986].) To obtain a reversal for this type of error, "the defendant need not demonstrate specific, outcome-determinative prejudice. [Citation.] But he must show that an actual conflict of interest existed and that that conflict adversely affected counsel's performance." (*People v. Bonin* (1989) 47 Cal.3d 808, 837–838 [254 Cal.Rptr. 298, 765 P.2d 460]; see generally *Mickens v. Taylor, supra,* 535 U.S. 162.)

■ " 'To show a violation of the corresponding right under our state Constitution, a defendant need only demonstrate a *potential* conflict, so long as the record supports an "informed speculation" that the asserted conflict adversely affected counsel's performance. [Citations.]' (*People v. Frye* (1998) 18 Cal.4th 894, 998 [77 Cal.Rptr.2d 25, 959 P.2d 183].) 'But "[p]ermissible speculation giving rise to a conflict of interest may be deemed an informed speculation . . . only when such is grounded on a factual basis that can be found in the record." ' [Citations.]

■ "To determine whether counsel's performance was 'adversely affected,' we have suggested that [*Cuyler v.*] *Sullivan*[*, supra,* 446 U.S. 335,] requires an inquiry into whether counsel 'pulled his punches,' i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney *not* to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission." (*People v. Cox, supra,* 30 Cal.4th at pp. 948–949.)

Defendant essentially complains that due to his threat to kill defense counsel, counsel became so concerned for his safety that he "pulled his punches" or otherwise conducted a less-than-vigorous defense, to defendant's detriment, that is, counsel acted to ensure his personal safety and thereby deprived defendant of the undivided loyalty a criminal defendant should expect from his legal representative. There is something perverse in this argument, for although defendant unquestionably was entitled to the effective assistance of a conflict-free attorney, defendant's own behavior created the alleged conflict and threatened to undermine his lawyer's effectiveness. We are reluctant to recognize a rule of law that would empower criminal defendants to inject reversible error into their trials by simply threatening their lawyers. (See *People v. Linares* (2004) 2 N.Y.3d 507, 512 [813 N.E.2d 609, 780 N.Y.S.2d 529, 532] ["That defendant backed his objections to

counsel's advice with the threat of violence does not" require replacement with a substitute attorney. "Substitution of counsel is an instrument designed to remedy meaningful impairments to effective representation, not to reward truculence with delay"].)

The situation is analogous to one where a criminal defendant attempts to create a conflict by filing a lawsuit against his lawyer. Faced with that situation in *People v. Horton* (1995) 11 Cal.4th 1068 [47 Cal.Rptr.2d 516, 906 P.2d 478], we concluded the defendant was not entitled to relief. "[T]he trial court properly determined, in the exercise of its discretion, that the filing of the complaint did not create any actual conflict of interest necessitating the withdrawal of appointed counsel. Although being named as a defendant in a collateral lawsuit by one's client *may* place an attorney in a situation in which his or her loyalties are divided [citation], a criminal defendant's decision to file such an action against appointed counsel does not require disqualification unless the circumstances demonstrate an actual conflict of interest. [Citation.] *A contrary holding would enable an indigent criminal defendant to challenge each successive appointment of counsel, delaying indefinitely the criminal prosecution.*" (*Id.* at p. 1106, second italics added.)

■ We emphasize that no rigid rule exists to preclude relief whenever a claimed conflict of interest with counsel originates in a defendant's own actions. We rely in the first instance on our trial courts to determine whether a criminal defendant is represented by an attorney truly laboring under conflicting interests or whether the defendant has simply engineered an apparent conflict in an attempt to delay the ultimate moment of truth, the jury's verdict. Here the court reasonably concluded that defendant, by threatening counsel, was simply trying to delay his trial. Thus, in denying a requested continuance based on defendant's threat to counsel, the court, speaking to defense counsel, opined: "[I]t appears that you do agree that your client is subject to manufacturing his own reasons for either a conflict, apparent conflict or delay. I am not . . . convinced that in 45 days the matter will be assuaged or that is such to be put to rest." The court concluded: "I feel your client is trying to manufacture a delay, that's all." When counsel later renewed the claim, the court, after eliciting from counsel that the circumstances had not changed, denied a continuance, saying: "The reasons you stated before were insufficient then, they are insufficient now." The record adequately supports the court's assessment of the situation.

■ Defendant contends defense counsel's views were more relevant than the trial court's assessment of whether an actual conflict existed. "A criminal defense attorney ' "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial" ' " (*People v. Hardy, supra,* 2 Cal.4th at p. 137), and his or

her opinion is "a significant factor when determining whether an actual conflict existed" (*ibid.*). But here counsel pronounced at the July 22 hearing that he simply needed additional time to repair his relationship with defendant in order to facilitate preparation of a defense, thereby implying no debilitating conflict existed. A month later, when counsel for the first time announced he was burdened by a conflict of interest as a result of defendant's threat against him, he admitted no new grounds had emerged that had not been discussed at the earlier hearing. In other words, there was no new threat. Defendant simply was refusing to communicate with counsel, hampering counsel's efforts and possibly undermining his own defense.

Although by September 16 defense counsel had unequivocally declared a conflict due to defendant's threats and continued refusal to cooperate, the trial court reasonably found "nothing in the record to reflect the breakdown of the attorney-client relationship of the magnitude to jeopardize the defendant's right to effective assistance of counsel. [¶] You are doing an exemplary job. You are making those points that you are seeking to make. Your client . . . may be seeking to run this trial, as he stated himself, in such a way that he either wants a mistrial or should try to inject error into this proceeding." Although we do not wish to minimize the stress under which counsel was operating, the trial court's conclusion was reasonable and supported by the evidence. Considering all the circumstances, we agree with the trial court that defendant was attempting to make good on his intention to avoid trial at all costs; he was attempting to disrupt and delay the trial by threatening his court-appointed lawyer, by threatening the prosecutor, and by refusing to speak to counsel. Defendant's meritless *Marsden* and untimely *Faretta*[7] motions, discussed *post*, are but additional elements of his effort to delay the inevitable. These were difficult circumstances under which to work, to be sure, but they fall short of demonstrating defense counsel was burdened by either an actual or potential conflict of interest.[8]

---

[7] *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*).

[8] At the penalty phase, defense counsel testified that defendant "insisted on numerous occasions that I not conduct any cross-examination of witnesses. [¶] In fact, when Jude Barrios testified he was very insistent that I not conduct any examination of her. And to the point that I agreed to limit my cross-examination of Jude." He added: "I must admit that there were times when I perhaps—I did what [defendant] asked because I considered our relationship to be so important. That I was his lawyer, and I have a legal and moral obligation to do everything I possibly can for him. I realized what he wanted to do from the start, and there was a potential conflict there."

Defendant cites this passage as evidence that counsel "pulled his punches" as a result of the conflict. We seriously doubt a defendant can condition his cooperation with counsel on counsel's agreement to abdicate his professional responsibilities during trial and then claim on appeal that his counsel was burdened with a conflict of interest. In any event, nothing in the aforementioned testimony suggests that counsel refrained from a more vigorous cross-examination of Barrios *as a result of defendant's threats*. Instead, counsel apparently made his

### 3. *The Trial Court's Failure to Intervene to Ensure Defendant Was Represented by Conflict-free Counsel*

██ Defendant next contends the trial court failed in its duty to conduct an independent inquiry into the alleged conflict of interest created by defendant's threat of violence. He contends the trial court's duty to inquire was all the more important because he had been excluded from the hearings in which defense counsel and the trial court discussed the issue. Although a trial court has the duty to inquire when it knows or reasonably should know a conflict of interest exists between client and lawyer (*People v. Seaton* (2001) 26 Cal.4th 598, 642 [110 Cal.Rptr.2d 441, 28 P.3d 175]), the court fulfilled this obligation by holding the hearings on July 22, August 20, and September 16, 1992. Our examination of the trial record confirms the trial court conducted a meaningful inquiry into the issue. We thus reject defendant's claim that the court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, as well as his claim that the court violated his rights under "parallel provisions" of the California Constitution.

### 4. *Denial of* Marsden *and* Faretta *Motions*

During the guilt phase, at the same time defense counsel sought to be relieved due to an alleged conflict of interest, defendant sought to relieve counsel. (*Marsden, supra,* 2 Cal.3d 118.) In addition, defendant sought to represent himself. (*Faretta, supra,* 422 U.S. 806.) As we explain, the trial court did not abuse its discretion when it denied these requests.

#### a. *Facts*

Defendant made his first *Marsden* motion on September 3, 1992, early in the guilt phase. After the prosecutor left the courtroom, defendant said: "I just want to say that I want to fire my lawyer because he don't listen to what I tell him. I tell him I already went through this trial before. I told him I want to take a deal for life [imprisonment] without [the possibility of parole]. I can't plead guilty to the death penalty. I told him don't be talking to the witness,

---

decision based on other tactical considerations, that is, to maintain a viable working relationship with his client. Further, we have examined counsel's cross-examination of Barrios and do not find it deficient in any way. Significantly, counsel elicited from Barrios that defendant had told her the shooting was accidental and that he (defendant) used marijuana every day.

We similarly reject defendant's claim that counsel's decision to reveal defendant's threats to the trial court showed an actual conflict, "unethically poisoning the trial court's view of defendant." Defendant's threats of violence formed the basis of counsel's motions for a continuance and to be relieved due to a claimed conflict. Counsel was obligated to support those motions by showing good cause. Under the circumstances, we conclude counsel's revelation of the threats does not evidence an actual conflict. In any event, we trust that the trial judge was able to maintain his impartiality in the face of such information.

my family. He come tell me he been talking to Jude [Barrios], my family. If not, I'll be my own lawyer if he is going to be like that. He is doing the same thing I can do." "You know, if I am going to get railroaded, I might as well railroad myself." Defense counsel corroborated defendant's claim that he had disobeyed defendant's request that he not speak to defendant's family. Citing *In re Horton* (1991) 54 Cal.3d 82 [284 Cal.Rptr. 305, 813 P.2d 1335],[9] the trial court denied defendant's motion to fire his lawyer, noting that counsel was in charge of trial strategy and that counsel was doing an "exemplary job." The court also found the motion was untimely. To the extent defendant's motion was also for self-representation, the court ruled that his statement that he would "rather represent myself" was not an unequivocal assertion of his right to self-representation and impliedly denied it on that basis.

Defendant made his second *Marsden/Faretta* motion on September 15, 1992, the fifth day of the guilt trial. Addressing the court in the prosecutor's absence, defendant stated: "I wanted to ask you again, because I am not sure if you understand the first time when I asked you about my attorney, I don't want him to be doing this already, I guess the defense for me. All I just want to wish is hurry up and get to the penalty phase because I don't want that. I keep on telling him that I don't, you know, want him doing certain things. [¶] I was informed by the court that, I guess, he is my lawyer, and, I guess, this is my case, and I just don't want him, I wish to fire him. I'd rather go pro per if I could." Defendant then stated that he would like two attorneys who were death penalty specialists. Addressing the *Marsden* motion first, the trial court denied it, reiterating that defense counsel was in charge of tactical decisions. To the extent defendant was seeking to replace counsel with other, more qualified attorneys, the trial court denied that motion as well, noting counsel was a "death penalty specialist [who] knows what he is doing."

The court then turned to defendant's *Faretta* motion and asked him to elaborate on his reasons. Defendant replied: "I feel that I might be able to do a better job. That's what I want to do. I don't want to cross-examine. I don't want to question no witness. I refuse to talk to any investigators or doctors or whatever that can be, you know." The trial court first noted the motion was untimely, and then denied it on the merits after considering the factors set forth in *People v. Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187]: "One, I have to determine the quality of counsel's representation of the defendant. And I have to say at this time it's been excellent. [¶] Two,

---

[9] "In the criminal context . . . counsel is captain of the ship. As we said recently: 'When the accused exercises his constitutional right to representation by professional counsel, it is counsel, not defendant, who is in charge of the case. By choosing professional representation, the accused surrenders all but a handful of "fundamental" personal rights to *counsel's* complete control of defense strategies and tactics.' " (*In re Horton, supra,* 54 Cal.3d at p. 95.)

defendant's prior proclivity to substitute counsel. I do note that some days ago defendant made the same motion. [¶] Three, the reasons for the request. I do note that right now the defendant stated that he just wants to get to the penalty phase as soon as possible. [¶] Fourth, the length and stage of the proceedings. This trial is many years old. We are in the midst of the People's case; it appears that the People are soon to rest. [¶] Five, the disruption and delay which might reasonably be expected to follow the granting of such motion." After eliciting from defendant that he would require a continuance to prepare for trial, the court resumed placing its reasoning on the record: "All right, this would cause quite a disruption. It would cause a mistrial, at the very least, the suspending of the trial for sometime." Observing that numerous appellate decisions have applied these factors set forth in *Windham*, the court denied defendant's *Faretta* motion.

Defendant's third and final combination *Marsden/Faretta* motion came on September 25, 1992, after the prosecutor had completed the first portion of his closing argument for the guilt phase of trial. After noting the motions were untimely, the trial court invited defendant to speak. The following colloquy then occurred:

"THE DEFENDANT: I just want you to reconsider that I wish to fire my attorney. You know, this case is over with already and there's no doubt in no one's mind about guilty or anything like that. I don't want my attorney to speak on these closing arguments.

"I'm down there with the pro pers. I'm right there in high power with all the pro pers, co-counsels. I want to speak. Do my last closing arguments if I could. If not go pro per or co-counsel in any way. I want to address the jury.

"You know—you know, this meeting, I don't have no defense. What's wrong with just doing this? I can't hurt no one else. This is it right here. I have no defense. I might as well, you know, go by myself. He can't say nothing for me to defend me. This case is over with.

"I just wish to say to the jury, you know, my closing arguments. I don't want him to speak for me.

"THE COURT: The problem that you told me right off the bat is that you are down there with the pro pers. These are people that are giving you bad advice. They are giving you bad advice.

"The case, as far as . . . this stage of the trial, this may be the last part of the trial. . . . There's only one thing left for your attorney to do and that's to argue the matter. He's well versed and we talked about that before. [¶] . . . [¶]

"THE DEFENDANT: Your honor, there's nothing to argue. Why should—he cannot say anything to say—I tried to plead guilty before in the past.

"THE COURT: What do you plan on doing, standing up, looking at the jury and say, 'convict me of everything'?

"THE DEFENDANT: If that's what I have to do. There's no reason to go through none of this out here. I wanted to plead guilty long ago. He refused.

"I just want life [imprisonment] without [possibility of parole]. You probably know yourself that ain't no joke. There ain't no difference. I just want you to let me live my life in jail. Death penalty—life without. I just want to live.

"There's no reason, you know, you should know yourself how it is in there, you know, just by sitting here and just, you know, sending everybody up state or people taking deals or whatever, there's no guarantee of nothing up there. It's life without. I'm going to high security prison. You know, that's a war zone up there. You know that. There's no guarantee. I might get killed up there anyway, before I even—how long I would make it in death row, whatever. I just want life without. You know, there's no argument to tell the jury."

The court denied the motions. "First of all, we have a number of factors to discuss. The first one is the defendant asking that counsel be replaced. Again, it is untimely, and can be denied on that basis alone. [¶] However, even if it were not [un]timely, again I heard the comments of [defense counsel] and he had diligently, and I stress that, advocated a defense and did everything in his power for the defendant." The court then denied defendant's request to argue his case personally, noting: "[A] trial court may authorize [such personal participation in the case by a represented defendant] upon a substantial showing that it will promote justice and judicial efficiency in a particular case. [¶] In this case the defendant told me basically what he wants to argue, which is in a sense to convict him of everything as charged. I do not feel that that is a substantial showing that it will promote justice and judicial efficiency in the particular case. [¶] The defendant's motion, if that's what it is, to address the jury is likewise denied as he is represented by competent counsel."

Finally, turning to defendant's *Faretta* motion, the trial court once again addressed the factors set forth in *People v. Windham, supra,* 19 Cal.3d 121, and concluded: "Based upon the totality of the circumstances I find that the motion is untimely."

### b. *Discussion of* Marsden *Motion*

 Defendants in capital cases often express dissatisfaction with their appointed counsel, affording us ample opportunity to address the contours of the rule set forth in *Marsden, supra,* 2 Cal.3d 118. The rule is well settled. " 'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Fierro* (1991) 1 Cal.4th 173, 204 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) The decision whether to grant a requested substitution is within the discretion of the trial court; appellate courts will not find an abuse of that discretion unless the failure to remove appointed counsel and appoint replacement counsel would "substantially impair" the defendant's right to effective assistance of counsel. (*People v. Smith* (2003) 30 Cal.4th 581, 604 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

 Applying these standards here, we conclude the trial court acted well within its discretion by denying all three of defendant's *Marsden* motions. At the outset, we agree with defendant that, to the extent any part of the trial court's decision to deny the three *Marsden* motions was based on untimeliness, it erred. A criminal defendant is entitled to raise his or her dissatisfaction with counsel at any point in the trial when it becomes clear that the defendant's right to effective legal representation has been compromised by a deteriorating attorney-client relationship. Because the trial court heard defendant's complaints in connection with each of the three *Marsden* motions, however, any reliance on the purported untimeliness was harmless under any standard.

Turning to the merits, we find no abuse of discretion. First, there was sufficient evidence supporting the trial court's conclusion that defense counsel was providing adequate legal assistance. Responding to the first two *Marsden* motions, the trial court explicitly noted that counsel was doing an "exemplary job," was a "death penalty specialist," was doing an "excellent" job, and was a "diligent" advocate on defendant's behalf. Defendant argues these characterizations of counsel's skill and experience were incorrect, noting counsel did not make an opening statement at the guilt phase[10] and did not call any defense witnesses at the guilt phase. But these events had not yet occurred at

---

[10] Counsel deferred his opening statement until after the People had rested. He then chose not to make one.

the time of defendant's first two *Marsden* motions and thus were unknown to the trial court. More to the point, defense counsel had a difficult task at the guilt phase because the evidence of defendant's guilt was overwhelming.[11] Although defense counsel did not call any witnesses for the defense, he raised on cross-examination the possibility that defendant was intoxicated when he committed the crime and that the shooting was an accident.

■ Second, the trial court acted within its discretion when it concluded the purported conflict between defendant and his lawyer was not " 'such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Fierro, supra,* 1 Cal.4th at p. 204.) As the record shows, defendant himself created the conflict. Defendant's dissatisfaction with counsel stemmed from counsel's failure to convince the district attorney to agree to a plea bargain sparing defendant's life and counsel's decision to contact defendant's family against his express wishes. These incidents, while evidently disquieting to defendant, do not rise to the level of a substantial impairment of his right to the effective assistance of counsel. To begin with, counsel actively sought a plea bargain to allow defendant to plead guilty in return for a sentence of life imprisonment, but was rebuffed by the district attorney's office. Moreover, counsel's decision to contact defendant's family over his express wishes was a tactical decision counsel was entitled to make. "A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense. [Citation.] Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' " (*People v. Welch* (1999) 20 Cal.4th 701, 728–729 [85 Cal.Rptr.2d 203, 976 P.2d 754].) The mitigating evidence presented in defendant's defense at the penalty phase is an indication of the wisdom of counsel's tactical choice in this regard.

■ Although defendant emphasizes that defense counsel himself several times asserted that he could not be an effective advocate, those assertions stemmed in part from defendant's refusal to speak to counsel. As we explained, *ante,* a criminal defendant cannot willfully refuse to cooperate with his appointed attorney, thereby possibly hampering his own defense, and then claim he is entitled to a new attorney because counsel has not been effective. The trial court reasonably deduced from the circumstances, including defendant's serial *Marsden* motions and his considered choice not to speak to counsel, that defendant was merely attempting to inject error and delay into the proceedings.

---

[11] In their separate trial, the jury for defendant's partners in crime, Zorns and Ayala, took only 30 minutes to convict them of murder and robbery.

Under the circumstances, we find the trial court did not abuse its discretion by denying the three *Marsden* motions. We further find no Sixth Amendment violation and reject defendant's attempt to equate the denial of his *Marsden* motions with the outright denial of counsel.

### c. *Discussion of* Faretta *Motion*

 The trial court also properly denied defendant's various requests to represent himself. The right to eschew a professional legal advocate and represent oneself in a criminal trial, first recognized by the United States Supreme Court in the seminal case of *Faretta, supra*, 422 U.S. 806, is one aspect of the constitutional right to present a defense under the Sixth Amendment to the federal Constitution (*People v. Koontz* (2002) 27 Cal.4th 1041, 1069 [119 Cal.Rptr.2d 859, 46 P.3d 335]), and the erroneous denial of this right is reversible per se (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 177, fn. 8 [79 L.Ed.2d 122, 104 S.Ct. 944]; *People v. Dent* (2003) 30 Cal.4th 213, 217 [132 Cal.Rptr.2d 527, 65 P.3d 1286]). The right, however, is not absolute. "To invoke the constitutional right to self-representation, a criminal defendant must make an *unequivocal* assertion of that right in a timely manner. [Citation.] 'The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied.' [Citation.] A reviewing court, in determining whether a motion for self-representation is unequivocal, is not bound by the trial court's apparent understanding that the defendant was making a motion for self-representation." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1087 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

 These limitations on the constitutional right to self-representation are particularly relevant here. The first of defendant's three *Faretta* motions was made on September 3, shortly after the guilt phase had begun. He complained to the trial court that defense counsel had contacted his family against his wishes and stated that "I'll be my own lawyer *if he is going to be like that.*" (Italics added.) The trial court denied the *Faretta* request because it was not unequivocal. We have emphasized that a *Faretta* request must be unequivocal. (*People v. Marshall* (1997) 15 Cal.4th 1, 20–25 [61 Cal.Rptr.2d 84, 931 P.2d 262].) This rule "is necessary in order to protect the courts against clever defendants who attempt to build reversible error into the record by making an equivocal request for self-representation." (*Id.* at p. 22.) This concern applies

here; circumstances strongly suggested defendant was attempting to delay the trial and did not state unequivocally and definitely that he wished to represent himself. The trial court acted properly in refusing to permit defendant to control and delay his trial.

We also conclude the trial court properly denied defendant's second *Faretta* motion, made on September 15. Applying the factors we set forth in *People v. Windham, supra,* 19 Cal.3d at page 128, the trial court denied the motion on the merits. Defendant contends the trial court misapplied these factors in a number of ways, but we disagree. Defendant first argues the trial court was incorrect when it concluded counsel's representation had been "excellent." Instead, defendant argues, counsel made no opening statement, called no witnesses, and had declared (in camera) that he could not be an effective advocate because defendant refused to speak with him. At the time of this motion, however, the People had called six witnesses and counsel had cross-examined each of them. Counsel had deferred making an opening statement, and the People had not yet rested. Counsel's confidential assessment of his own ability to provide effective assistance of counsel was based on defendant's refusal to speak to or cooperate with him. The trial court's implicit conclusion that no irreconcilable rift had occurred between client and counsel, and that defendant was merely attempting to delay the trial, was a reasonable one.

Defendant next argues that contrary to the court's conclusion when it denied his second *Faretta* motion, he had no prior proclivity to substitute counsel. His contention is belied by the record, for he had made a similar motion just a few days before. The reason for his request, the third *Windham* factor, had not essentially changed from the time the court denied the first motion for self-representation. As the trial court noted, defendant did not think he could do a better job, but merely wanted to speed up the guilt trial so he could proceed to the penalty phase as soon as possible. The trial court properly concluded this reason would not support a midtrial decision to permit defendant to fire his lawyer and represent himself. The final *Windham* factors (the length and stage of the trial and the disruption and delay that would result from granting the motion) also strongly support the trial court's denial of the *Faretta* motion. Defendant's case had dragged on for more than two years, and defendant's second *Faretta* motion came in the middle of the guilt phase. Defendant affirmed that he would need a continuance to prepare for trial, leading the trial court reasonably to conclude that granting a mistrial would be necessary if it permitted defendant to represent himself at that late date.

Defendant argues that "[d]elay, and delay alone, should not be the determining factor," but that argument misconstrues the nature of the trial court's ruling. The court considered several factors other than the delay that would ensue if it granted the motion. Defendant also contends an "objective assessment" of the propriety of the trial court's denial of his second *Faretta* motion should consider the court's eve-of-trial denial of a requested 45-day continuance and the denial of his motion for appointment of second counsel. He argues that his *Faretta* motion was not made sooner because the denial of these motions sparked his dissatisfaction with defense counsel, which led to the motion for self-representation. Thus, he argues, the delay in making the motion was understandable. There are several answers to this claim. First, defendant had made an earlier *Faretta* motion. In denying the second motion, the trial court noted the previous, equivocal motion. Thus, this is not a case in which a defendant made a *Faretta* motion as soon as was practicable. Second, the trial court chose not to deny the motion as untimely; defendant therefore was not penalized for the belated nature of his motion. Third, nothing in the record indicates that defendant's dissatisfaction with counsel was linked to the denial of a continuance or the denial of second counsel. Defendant proclaimed in court that he wished to represent himself and that he could do a better job than counsel, but "I don't want to cross-examine. I don't want to question no witness. I refuse to talk to any investigators or doctors or whatever that can be, you know." Under the circumstances, the trial court did not err in denying defendant's second *Faretta* motion.

We reach the same conclusion with regard to defendant's third *Faretta* motion, made and denied as untimely on September 25. By the time defendant made this last *Faretta* motion, presentation of evidence at the guilt phase was complete and the prosecutor had finished the opening part of his closing statement. All that was left of the guilt phase was defense counsel's closing argument and the prosecutor's rebuttal. The trial court denied the motion, noting specifically that defendant "wishes merely to have the jury convict him of all counts and all allegations so he can just ask for life in prison without the possibility of parole, and end the matter" and that the trial was "about to wind down to an end." The court also noted the "disruption of the delay which might reasonably be expected to follow the granting of such motion." We find no abuse of discretion. Contrary to defendant's further argument, the trial court did not focus on any one fact but, as it expressly stated, denied the motion based on the *totality of the circumstances*. (*People v. Barnett, supra,* 17 Cal.4th at p. 1109.)

Even if the guilt phase judgment must stand, defendant claims the penalty judgment must be reversed because the trial court abused its discretion in denying this third *Faretta* motion. He argues the motion came at a convenient time as it was between the guilt and penalty phases of the trial and that no delay would have resulted because he did not request a continuance. The

mere fact this third *Faretta* request came between the guilt and penalty phases is of no moment, for the request is still considered to be one made midtrial. "[T]he penalty phase has no separate formal existence but is merely a stage in a unitary capital trial." (*People v. Hamilton* (1988) 45 Cal.3d 351, 369 [247 Cal.Rptr. 31, 753 P.2d 1109].) Accordingly, defendant was not entitled to invoke the absolute right of self-representation. (*Ibid.*) Finding no abuse of discretion, we reject defendant's claim that we must reverse the penalty judgment.

In sum, the trial court properly denied all three of defendant's *Faretta* motions.

### 5. *Denial of* Keenan *Counsel*

Defendant next contends the trial court abused its discretion when it twice denied his motion for appointment of a second attorney to assist defense counsel. He further claims the court's refusal to appoint second counsel violated his state and federal constitutional rights to effective assistance of counsel, to due process of law, to a fair trial, and to a reliable sentencing determination, and constituted an arbitrary deprivation of an entitlement under state law. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 15, 16, 17.)

██ The right to counsel is, of course, a bedrock constitutional right (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; see *Gideon v. Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792]), but California's interest in ensuring that those charged with capital crimes receive adequate legal representation manifests itself in a further layer of protection: courts have the statutory discretion to appoint a second defense attorney at public expense. (*People v. Weaver* (2001) 26 Cal.4th 876, 950 [111 Cal.Rptr.2d 2, 29 P.3d 103]; *Keenan v. Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108] (*Keenan*); § 987, subd. (d).)[12] But unlike the constitutional right, the statutory right to appointed second counsel is qualified. Thus, "[i]f it appears that a second attorney may lend important assistance in preparing for trial or presenting the case, the court should rule favorably on [a] request. Indeed, in general, under a showing of genuine need . . . a presumption arises

---

[12] Section 987, subdivision (d) provides: "In a capital case, the court may appoint an additional attorney as a cocounsel upon a written request of the first attorney appointed. The request shall be supported by an affidavit of the first attorney setting forth in detail the reasons why a second attorney should be appointed. Any affidavit filed with the court shall be confidential and privileged. The court shall appoint a second attorney when it is convinced by the reasons stated in the affidavit that the appointment is necessary to provide the defendant with effective representation. If the request is denied, the court shall state on the record its reasons for denial of the request."

that a second attorney is required." (*Keenan, supra,* at p. 434.) " 'The initial burden, however, is on the defendant to present a specific factual showing as to why the appointment of a second attorney is necessary to his defense against the capital charges.' [Citation.] An 'abstract assertion' regarding the burden on defense counsel 'cannot be used as a substitute for a showing of genuine need.' " (*People v. Staten* (2000) 24 Cal.4th 434, 447 [101 Cal.Rptr.2d 213, 11 P.3d 968].) With these rules in mind, we turn to an analysis of defendant's two *Keenan* requests.

On March 6, 1992, well before the start of trial, defense counsel moved for second, or *Keenan,* counsel. Noting that the case would probably proceed to a penalty phase, counsel stated: "I consider this to be a complicated case because of the number of witnesses that will testify. The fact is that investigation in this case is ongoing, that I will need to interview witnesses myself rather than just rely upon investigators. There are witnesses that will be inconsistent with the statements that were made by other witnesses during the trial proceeding and I would ask the court . . . to appoint second counsel. This case warrants [such appointment] because of the high probability that we will proceed to penalty phase." The trial court denied the request, saying: "The fact that a case in your opinion is almost assured to go to penalty phase is not the specific and compelling reasons that [precedent] require[s]. . . . [Y]ou are an experienced capital attorney [and] the fact that a case is going to go to penalty phase itself is not sufficient in and of itself [to appoint second counsel]."

Defense counsel then explained that his *Keenan* request was not solely based on the probability of a penalty phase. "I must also indicate to the court that based upon my independent investigation that the witnesses that testified in the case of People versus Ayala and Zorns, their statements will be contradicted in part by witnesses that will be presented by Mr. Roldan, and I need the assistance of another attorney to do that." Counsel thought the task of coordinating such witnesses was more than one attorney could handle. The trial court disagreed: "I have had the unusual circumstance of actually sitting through the factual bases for this trial one time already and the trial with the two defendants lasted some four weeks. I cannot see the evidence, as far as the People's case is concerned, lasting even that long as far as your client is concerned."

Counsel then explained that he had been working as second counsel in another capital case and was undertaking defendant's case "literally back to back," that there was a lot of work in the other case, and that he sought to have lead counsel in the other case be appointed as second counsel in defendant's case. The trial court disagreed that counsel would be ineffective without the appointment of second counsel, noted that counsel was being

"overly modest" about his abilities, and concluded: "Based upon my discretion, weighing the factors here and understanding the facts as I understand them thus far in this case I am denying your motion for appointment of second counsel." The court added: "My ruling is not in concrete and if there [are] reasons that come up, specific and compelling reasons, I will be glad at any time to entertain such a motion."

The decision whether to grant a request to appoint second counsel under section 987 is reviewed for abuse of discretion. (*People v. Ochoa* (1998) 19 Cal.4th 353, 408 [79 Cal.Rptr.2d 408, 966 P.2d 442].) The abuse of discretion standard is used in many other contexts and reflects the trial court's superior ability to consider and weigh the myriad factors that are relevant to the decision at hand. A trial court will not be found to have abused its discretion unless it "exercised its discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice." (*People v. Lawley* (2002) 27 Cal.4th 102, 158 [115 Cal.Rptr.2d 614, 38 P.3d 461] [addressing exercise of discretion to permit a jury to view defendant's cabin].)

On these facts, we cannot find the trial court abused its discretion. Defense counsel's explanation that he would be required personally to interview additional witnesses who would provide impeachment evidence was respectfully discounted by the trial court, who had firsthand knowledge of the weight and nature of the evidence of guilt, having presided over the trial of Sergio Ayala and Richard Zorns. In fact, the case was quite straightforward, as eyewitnesses had identified defendant as the gunman, and both his girlfriend, Jude Barrios, and Richard Zorns's then girlfriend, Christine, testified to his damaging and incriminating admissions. Counsel's further explanation that he was overloaded by conducting back-to-back trials was no doubt discounted by the court given the fact defendant's trial was not to begin for several months. Finally, the trial court had discretion to rely on its own evaluation of counsel's competence.[13]

Defense counsel renewed the *Keenan* motion on July 22, 1992, in conjunction with his request for a continuance prompted by the threats of violence revealed by Dr. Maloney. Despite counsel's understandable anxiety over the threat to his life, he did not articulate any specific need for the services of second counsel at this hearing over and above the abstract desire for assistance. (*People v. Staten, supra,* 24 Cal.4th at p. 447.) Accordingly, the trial court did not abuse its discretion when it denied the renewed request.

---

[13] Defendant also contends the trial court abused its discretion because defense counsel needed assistance to meet the prosecutor's evidence, at the penalty phase, of defendant's three prior crimes. We agree with respondent that defense counsel bore the burden of demonstrating the need for the appointment of second counsel (*People v. Staten, supra,* 24 Cal.4th at p. 447) and cannot rely on appeal on arguments not presented to the trial court.

## 6. *Restriction of Voir Dire*

Defendant next contends the trial court improperly restricted voir dire in a number of ways, prejudicially inhibiting his ability to identify prospective jurors who might have been subject to a challenge for cause and those who should have been removed by the exercise of a peremptory challenge. He claims the trial court's restrictions violated his federal constitutional rights to due process of law, to an impartial and representative jury, to a jury drawn from a fair cross-section of the community, to a fair trial, and to a reliable capital sentencing determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.) He also claims the court's restrictions violated "parallel provisions" of the California Constitution.[14]

We begin with the obvious: A criminal defendant is entitled to a trial by jurors who are impartial and unbiased. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.) Although neither the state nor federal Constitution expressly mentions the impartiality of jurors, courts have long interpreted both charters to encompass the right to impartial jurors. (*Turner v. Louisiana* (1965) 379 U.S. 466, 471–472 [13 L.Ed.2d 424, 85 S.Ct. 546]; *People v. Wheeler* (1978) 22 Cal.3d 258, 265 [148 Cal.Rptr. 890, 583 P.2d 748].) " '[T]he right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the [C]onstitution.' " (*People v. Earp* (1999) 20 Cal.4th 826, 852 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

The impartiality of prospective jurors is initially determined during the pretrial procedure known as voir dire. "*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. [Citation.] Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule." (*Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188 [68 L.Ed.2d 22, 101 S.Ct. 1629].) "*Voir dire* examination serves to protect [an accused's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on *voir dire* may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges." (*McDonough Power Equipment, Inc. v. Greenwood* (1984) 464 U.S. 548, 554 [78 L.Ed.2d 663, 104 S.Ct. 845]

---

[14] Although defendant does not separately argue the state Constitution provides greater protection against restriction of voir dire than does the federal Constitution, we conclude he has adequately raised the state constitutional issue.

(plur. opn. of Rehnquist, J.).) "The ability of a defendant, either personally, through counsel, or by the court, to examine the prospective jurors during voir dire is thus significant in protecting the defendant's right to an impartial jury." (*In re Hitchings* (1993) 6 Cal.4th 97, 110 [24 Cal.Rptr.2d 74, 860 P.2d 466].)

■■ Choosing a jury for a capital case poses a special problem. "The state and federal constitutional guarantees of a trial by an impartial jury include the right in a capital case to a jury whose members will not automatically impose the death penalty for all murders, but will instead consider and weigh the mitigating evidence in determining the appropriate sentence. [Citation.] '[A] juror may be challenged for cause based upon his or her views concerning capital punishment only if those views would "prevent or substantially impair" the performance of the juror's duties as defined by the court's instructions and the juror's oath.' [Citations.] If the death penalty is imposed by a jury containing even one juror who would vote automatically for the death penalty without considering the mitigating evidence, 'the State is disentitled to execute the sentence.' " (*People v. Weaver, supra,* 26 Cal.4th at p. 910, quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844], and *Morgan v. Illinois* (1992) 504 U.S. 719, 729 [119 L.Ed.2d 492, 112 S.Ct. 2222].)

### a. *The Voir Dire Procedure*

At the beginning of voir dire, the trial court asked prospective jurors whether they wished to be excused for hardship. Those whose claim of hardship the court accepted were excused. Those remaining were asked to fill out a 24-page juror questionnaire. The questionnaire asked jurors to reveal their place of residence, occupation, military service, marital status, education, and contacts with the justice system. It also asked jurors whether they had heard about defendant's case or about defendant and, if so, whether the information about the case made them favor the prosecution or the defense, what newspapers they read and television news they watched, and whether they followed other crime stories in the news. Finally, the questionnaire asked several questions regarding the jurors' views about the death penalty. The court photocopied the completed questionnaires and distributed copies to both the prosecutor and defense counsel.

The trial court, having decided to choose six alternate jurors for this trial, called the first 18 prospective jurors, 12 to sit in the jury box and six to sit as alternates. The trial court asked each juror in open court whether the juror wished to change any of his or her answers in the questionnaire. The court then asked the jurors individually four questions regarding their willingness and ability to return a verdict of first degree murder, to sustain a special

circumstance allegation, and to vote for either life imprisonment or for the death penalty. Questions regarding sensitive and personal matters were asked at the bench, out of the hearing of the other jurors, but the balance of the questioning was done in open court. Some jurors were excused on stipulation by both sides, some by the court on its own motion, and some for cause due to their views on the death penalty. The trial court then had all prospective jurors leave the courtroom and entertained challenges for cause from the parties. When both sides indicated they intended to make no further challenges for cause, the jury was brought in and the parties exercised their peremptory challenges. The procedure continued until 12 jurors and six alternates were chosen.

### b. *Failure to Hold Sequestered Voir Dire*

Defendant first contends the trial court committed prejudicial error by failing to sequester the jurors and question them individually. He admits the procedure used was authorized by section 223 of the Code of Civil Procedure, added to the code when the electorate passed Proposition 115 in 1990. That section provides in part: "Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." Defendant nevertheless contends that nonsequestered voir dire tends generally to produce juries more likely to return a guilty verdict than to acquit, and more likely to choose the death penalty over life imprisonment. More specifically, defendant contends the nonsequestered voir dire in this case allowed prospective jurors to hear (and thus become prejudiced by) concerns expressed by some jurors about possible gang involvement in the trial, as well as the nature of some pretrial publicity.

Defendant failed to object to the trial court's decision to conduct voir dire in open court and thus failed to preserve the issue for appeal. (*People v. Avena* (1996) 13 Cal.4th 394, 413 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) Had he moved for sequestered, individual voir dire and the trial court denied the motion, we would have had to determine whether the trial court abused its discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 713–714 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

Conceding that section 223 of the Code of Civil Procedure creates a preference for nonsequestered voir dire in capital cases, and that Proposition 115 was designed to supersede the contrary rule established in *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80–81 [168 Cal.Rptr. 128, 616 P.2d 1301] (see *People v. Gurule* (2002) 28 Cal.4th 557, 596, fn. 6 [123 Cal.Rptr.2d 345, 51 P.3d 224]), defendant nevertheless argues the trial court would have abused its discretion in denying a motion for sequestered voir dire because the procedures followed by the court denied him critical information about

the prospective jurors. He cites *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299 [279 Cal.Rptr. 592, 807 P.2d 434], in support, where we explained that "[t]here is no reason to believe that the new voir dire rules will be applied to deprive [defendants] of any information to which voir dire is legitimately directed." He does not, however, indicate how the nonsequestered voir dire procedure deprived him of relevant information, given the detailed jury questionnaires and the follow-up questions asked by the trial court. Accordingly, even were we to assume defendant had properly preserved this claim with a timely objection, it is meritless.

### c. *Court-only Questioning*

In a related claim, defendant contends the trial court's voir dire of prospective jurors "unfairly limited the amount of information that defense counsel received." As with the decision not to sequester the jurors, however, defendant failed to preserve this issue by objecting. (*People v. Hernandez* (2003) 30 Cal.4th 835, 855–856 [134 Cal.Rptr.2d 602, 69 P.3d 446].) Even assuming the issue was properly before us, defendant fails to explain what type of information was missing or how the detailed jury questionnaires and follow-up questions from the bench were inadequate. Accordingly, the claim is meritless.

### d. *Refusal to Ask Follow-up Questions*

Defendant cites several instances in which he sought unsuccessfully to have the trial court conduct additional questioning of certain prospective jurors in order to have them elaborate on the answers given in their questionnaires and during in-court examination. By denying these requests, he claims, the trial court compromised his ability to acquire sufficient information to exercise his challenges, both for cause and peremptorily, in an intelligent manner and thereby violated his constitutional rights.

Although defendant identifies 14 prospective jurors of whom he sought to have the trial court ask additional questions on voir dire, only two actually served on his jury. Accordingly, even assuming error as to the other 12, no prejudice could have resulted from the trial court's refusal to engage in supplementary voir dire questioning as to them. (*People v. Burgener* (2003) 29 Cal.4th 833, 866 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Ramos* (1997) 15 Cal.4th 1133, 1157 [64 Cal.Rptr.2d 892, 938 P.2d 950].) The two who served on defendant's jury were Juror B.R. and Juror H.R. In his questionnaire, Juror B.R. made clear he was in favor of the death penalty,[15]

---

[15] Asked what his "general feelings" were concerning the death penalty, Juror B.R. responded: "I am in favor of the death penalty. I feel one should be punished for their crimes committed." He also wrote that the death penalty was imposed "too seldomly. There are a lot of people awaiting [the] death penalty for their crimes."

but would not automatically vote for death without considering the evidence, both aggravating and mitigating, including defendant's background and character. When questioned in open court, he affirmed he would not automatically vote for death as the appropriate penalty and that he would follow the law as described by the trial court even if he did not agree with it. Defense counsel requested "supplemental voir dire" of Juror B.R. and also challenged him for cause. The trial court denied both the request and the challenge, noting the juror "pass[ed] *Wainwright v. Witt* scrutiny, both on the questionnaire and in open court, and [expressed] the general feelings that he has, the evident frustration in the criminal justice system, as well as his views of punishment in general."

Like Juror B.R., Juror H.R. also expressed favorable views about the death penalty in her jury questionnaire,[16] but indicated she could set aside her personal feelings and follow the law as explained by the trial court. In open court, she affirmed she would not automatically vote for the death penalty. As with Juror B.R., defense counsel challenged Juror H.R. for cause and, in the alternative, requested that the trial court "ask additional questions of her." The trial court denied the challenge for cause, explaining that "[h]er views generally are that the death penalty is a deterrent. She answered twice both in the [questionnaire] and orally the *Wainwright v. Witt* questions and does not fall within the standard." The court also denied the request for additional voir dire questioning.

In neither case did defense counsel explain to the trial court what additional questions he sought to have asked, what subjects needed additional exploration, or why the existing information he had about Jurors B.R. and H.R. (from their detailed questionnaires and from their answers to the in-court questioning by the trial court) was insufficient to exercise his challenges intelligently. Nor does he now explain what additional information he had hoped to discover by having the court ask additional questions. Although defendant relies on *People v. Cash* (2002) 28 Cal.4th 703, 718–723 [122 Cal.Rptr.2d 545, 50 P.3d 332], that case is distinguishable. In *Cash*, the defendant sought to ask prospective jurors additional questions on a particularly relevant topic that, on the facts of that case, could have undermined their assertions of impartiality. Concluding the trial court committed reversible error by refusing to permit additional questions, we explained that "the trial court's ruling prohibited defendant's trial attorney from inquiring during

---

[16] Asked what her "general feelings" were regarding the death penalty, Juror H.R. answered: "I am for the death penalty. It cost thousands of tax dollars each year to keep a criminal incarcerated. If the guilty party maliciously took someone's life then the same should be done unto him." She also responded that the death penalty was imposed "too seldomly—hundreds are still being murdered [and] the jails are becoming overcrowded. Some of these prisoners should be made an example."

voir dire whether prospective jurors would automatically vote for the death penalty if the defendant had previously committed another murder. Because in this case defendant's guilt of a prior murder (specifically, the prior murders of his grandparents) was a general fact or circumstance that was present in the case *and that could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances,* the defense should have been permitted to probe the prospective jurors' attitudes as to that fact or circumstance. In prohibiting voir dire on prior murder, *a fact likely to be of great significance to prospective jurors,* the trial court erred." (*Id.* at p. 721, italics added.)

Here, in contrast, defendant identifies no fact about his case that is comparable in relevance to the prior murders in *People v. Cash, supra,* 28 Cal.4th 703, facts that could potentially have prejudiced even a reasonable juror. There were in this case no prior murders, no sensational sex crimes, no child victims, no torture. (See, e.g., *id.* at p. 721.) That defendant personally committed the murder was not seriously in question.

Because defendant does not explain what additional information he sought to have elicited or how the existing information about Jurors B.R. and H.R. was inadequate, and because it appears defendant had sufficient information to intelligently exercise his challenges, we find the trial court did not abuse its discretion by denying the requests for additional voir dire questioning of Jurors B.R. and H.R. (*People v. Waidla, supra,* 22 Cal.4th at pp. 713–714 [applying the abuse of discretion standard of review].)[17]

e. *Questioning on Pretrial Publicity*

Defendant next contends the trial court's inquiry into the effect of pretrial publicity on the impartiality of the jury pool was inadequate. At the threshold, we find defendant failed to preserve this claim for appeal by failing to object to the questionnaire or to the manner or completeness of the court's questioning on this issue. (*People v. Sanchez* (1995) 12 Cal.4th 1, 61–62 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; see also *Turner v. Murray* (1986) 476 U.S. 28, 37 [90 L.Ed.2d 27, 106 S.Ct. 1683] ["a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant

---

[17] Also distinguishable is our recent decision in *People v. Stewart* (2004) 33 Cal.4th 425 [15 Cal.Rptr.3d 656, 93 P.3d 271], where we reversed the penalty judgment when the trial court granted five challenges for cause based solely on somewhat ambiguous responses in the jury questionnaires. As noted, the trial court here conducted an in-court oral voir dire of every prospective juror and followed up on hesitant or equivocal responses. Sensitive or personal matters were addressed orally with the juror at sidebar, out of the hearing of the other jurors. The trial court was thus able to observe the demeanor of the jurors. (See *id.* at p. 451.) Unlike *People v. Stewart,* this was not a case where the trial court failed to conduct any clarifying follow-up examinations.

has specifically requested such an inquiry"].) We also reject the claim on the merits. The jury questionnaire filled out by all prospective jurors asked them whether they had any knowledge of defendant's case (question 30) and, if so, what they had learned about it (question 32), where they learned it (question 32(a)), and whether the information made them favor the prosecution or the defense (question 32(b)); what newspapers they read frequently (question 33) and what portion of the paper they read (question 33(a)); whether they followed major crime stories and, if so, which ones (question 33(b)); what was the last book they read (question 33(c)); what radio and television news broadcasts they had seen or heard (question 34); whether they follow criminal cases in the broadcast media and, if so, which ones (question 34(a)); what was the most serious crime story they followed that year (question 35); whether they try to follow stories about the functioning of the criminal justice system (question 36); and whether they could follow an instruction not to "read, view or discuss any news media coverage of this case" (question 37). Jurors with knowledge of the case who were unable or unwilling to set their feelings aside were excused by the trial court. None of the 12 jurors who sat on defendant's jury expressed any hint in their questionnaires that they were in any way tainted by pretrial publicity about defendant's case. Defendant's claim that the trial court's inquiry into pretrial publicity was somehow inadequate is wholly baseless. (See *People v. Sanchez, supra*, at pp. 62–63 [reliance on jury questionnaire].)

### f. *Questioning on Racial Bias*

██ Defendant is of Puerto Rican descent. His victim, Roland Teal, was African-American. Defendant contends the trial court abused its discretion by failing to adequately question the prospective jurors as to whether racial prejudice might affect their impartiality. As with the previous claim regarding the possible impact of pretrial publicity on the jurors, we find defendant did not preserve this claim for appeal because he failed to object to the questionnaire or to the manner or completeness of the court's questioning concerning racial prejudice. (*People v. Sanchez, supra*, 12 Cal.4th at pp. 61–62; see also *Turner v. Murray, supra*, 476 U.S. at p. 37.) We also reject the claim on the merits. Question 47 in the jury questionnaire asked: "A part(ies), attorney(s) or witness(es) may come from a particular national, racial or religious group or has a life style different from your own. Would that fact affect your judgment or the weight and credibility you would give to his or her testimony." Although, as defendant urges, this question is not a model of clarity, all 12 jurors answered it in the negative. This was not a case in which racial prejudice was an obvious issue. (See *People v. Earp, supra*, 20 Cal.4th at pp. 854–855.) We emphasize that a trial court retains discretion "as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively." (*Turner v. Murray, supra*, at p. 37.) Because defendant does not explain how

the jury questionnaire was inadequate to reveal hidden racial discrimination among the jurors, and because it appears he had sufficient information to intelligently exercise his challenges, we find the trial court did not abuse its discretion by relying on the jury questionnaire to address the issue of possible racial bias among the prospective jurors.

Finally, defendant emphasizes that "the cumulative effect of a restrictive [voir dire] process . . . undermined the proper purpose of jury selection" and requires reversal. Having found no abuse of discretion and no constitutional violation, we also reject the claim of cumulative prejudice.

### 7. *Excusal of Two Jurors for Cause*

Defendant contends that during the death penalty qualification of prospective jurors, the trial court erroneously granted two of the prosecutor's challenges for cause, thereby violating defendant's constitutional rights to a representative jury, to a jury drawn from a fair cross-section of the community, to a fair trial, to due process of law, and to a reliable sentencing determination, citing the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and "parallel provisions" of the state Constitution.

In *Wainwright v. Witt, supra,* 469 U.S. 412, the United States Supreme Court set forth the proper procedures for choosing jurors in capital cases. That case "requires a trial court to determine 'whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' [Citation.] 'Under *Witt,* therefore, our duty is to "examine the context surrounding [the juror's] exclusion to determine whether the trial court's decision that [the juror's] beliefs would 'substantially impair the performance of [the juror's] duties . . .' was fairly supported by the record." ' [Citations.] [¶] In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1093–1094 [31 Cal.Rptr.2d 321, 875 P.2d 36].)

Defendant contends the trial court improperly excused two prospective jurors for cause. Juror M.B. was a 72-year-old widow. Asked in the questionnaire to explain her "general feelings regarding the death penalty," she replied: "Death penalty I can't live with. It will always haunt me [be]cause I'm not God to say who deserves to live or die." Asked whether the penalty

was imposed too often or too seldom, she replied: "Have no opinion since I do not believe in death penalty." Asked whether she "automatically" would vote one way or another, she replied: "I don't know." When the trial court, following up on these responses, asked Juror M.B. whether she had a conscientious objection to the death penalty, she replied: "Hm . . . ." She denied that she would automatically vote against a special circumstance allegation to avoid the death penalty question, but when asked whether she would automatically vote for life imprisonment "and never vote for a verdict of death," she admitted: "Probably, yeah. It's very hard." The court probed this issue further, asking: "No one says this is going to be easy. You said your answer was probably never?" She agreed: "Probably never." When defense counsel objected to the prosecutor's challenge for cause (which the trial court invited), the court explained: "Under People versus Pinholster [*People v. Pinholster* (1992) 1 Cal.4th 865 [4 Cal.Rptr.2d 765, 824 P.2d 571]] . . . , it held that there was sufficient grounds to excuse a prospective juror for cause where the juror states he would have a quote, 'hard time,' quote, 'imposing death in a case [in] which a burglar stabbed an adult victim.' [¶] In this case this juror went beyond that as stated in Pinholster and stated that basically she thinks she could not vote [for] death in this case. [¶] The challenge for cause is sustained."

■■■ Defendant characterizes the trial court's examination of Juror M.B. as revealing that she was "concerned and a little nervous, but attempting to do her civic duty." He contends the ambiguities in her responses were never clarified and that because a person rarely, if ever, sits on a capital jury, "[s]tating that one would 'probably never' vote for death is consistent with the assertion that one could vote for death in extreme and deserving circumstances." As the trial court recognized, however, we previously have held it permissible to excuse a juror who indicated he would have a "hard time" voting for the death penalty or would find the decision "very difficult." (*People v. Pinholster, supra,* 1 Cal.4th at pp. 916–917.) These are not magic phrases, of course, but they indicate a degree of equivocation on the juror's part which, taken into account with the juror's hesitancy, vocal inflection, and demeanor, can justify a trial court's conclusion regarding the juror's mental state that the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt, supra,* 469 U.S. at p. 424.) Such decisions are committed to the discretion of the trial court, which is able to observe the juror's demeanor firsthand. That Juror M.B. was somewhat equivocal and might have been rehabilitated with further voir dire does not require a different result. "There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1146 [36 Cal.Rptr.2d 235, 885 P.2d 1].) "Rather, it is sufficient that the trial judge is left with the definite impression

that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror." (*Id.* at p. 1147.) The record supports the court's exercise of discretion sustaining the prosecutor's challenge for cause of Juror M.B.

We reach the same conclusion for Juror V.Z., whose exclusion defendant also challenges as contrary to the standard set forth in *Wainwright v. Witt, supra*, 469 U.S. 412. Juror V.Z. was a 47-year-old teacher. Asked in the questionnaire to explain her "general feelings regarding the death penalty," she replied: "I don't like it, but can understand why sometimes it's necessary, although I always feel bad when someone is executed." Asked whether the penalty was imposed too often or too seldom, she replied: "I can't answer this[, I have] too many mixed feelings." Asked whether she "automatically" would vote one way or another, she replied: "I don't think so." The trial court followed up on these responses, asking Juror V.Z. whether, due to a conscientious objection to the death penalty, she would refuse to vote for a first degree murder verdict to avoid reaching the penalty phase, to which she replied: "I honestly don't know." Asked whether, based on a conscientious objection to the death penalty, she would vote "not guilty" irrespective of the evidence so as to avoid the death penalty question, she replied: "I find it hard to answer that" and "I don't know. I really don't."

Asked whether she would automatically find a special circumstance allegation "not true," she replied: "I don't think so" and "Well, it's just I have never been in a situation like this and I really don't know how, you know, I would vote, if I would at all. It's very hard for me." After further probing, Juror V.Z. concluded: "No, I don't think I could *ever* vote for death." (Italics added.)

The prosecutor challenged Juror V.Z. for cause, and defense counsel objected, explaining: "I think [Juror V.Z.] is attempting to articulate the fact that this is one of the most difficult decisions that any individual could possibly confront. Her questions [*sic*: answers?] are equivocal. She is indicating that . . . she would have difficulty with the process, but she is willing to abide by the legal standards that would be required of her by the law. She hasn't indicated that . . . under all circumstances she would vote for life without the possibility of parole and never consider the death penalty." He added that excluding her for cause would deprive him of a jury drawn from a representative cross-section of the community. Noting certain of this court's decisions in which we approved the exclusion of prospective jurors who gave similar answers on voir dire, the trial court ruled that "based upon the equivocal responses in the questionnaire, and the responses here in court,

which are not equivocal, under the *Witt* standard there [are] sufficient grounds to sustain the challenge for cause, and it is sustained." The court then added that the "excusal of those persons that cannot impose death does not violate the fair cross-sectional rule."

We conclude the trial court did not abuse its discretion in determining that Juror V.Z.'s views would " 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.' " (*Wainwright v. Witt, supra,* 469 U.S. at p. 424.) Although her initial equivocation was apparent and could itself have supported the court's decision (see *People v. Welch, supra,* 20 Cal.4th at p. 747), she ultimately declared she could not "ever vote for death." The trial court obviously believed her, a credibility determination that, on this record, is binding on this court. (*People v. Fudge, supra,* 7 Cal.4th at p. 1094.)

The trial court did not abuse its discretion by granting the prosecutor's challenges for cause and excusing Jurors M.B. and V.Z. To the extent defendant contends the exclusion of these jurors violated other constitutional rights, including his right to a fair cross-section of the community, we reject those claims as well. (*People v. Gurule, supra,* 28 Cal.4th at p. 597.)

### 8. *Alleged* Wheeler *Error*

■■■ Defendant next claims the prosecutor violated his constitutional rights by excusing four prospective jurors on the basis of their race. (*People v. Wheeler, supra,* 22 Cal.3d 258 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*).) " 'In [*Wheeler*] . . . we held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in *Batson* . . . the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 116 [109 Cal.Rptr.2d 31, 26 P.3d 357], citation omitted.) Defendant also contends the trial court's denial of his *Wheeler/Batson* motion violated his constitutional right to a fair trial, to a fair jury drawn from a fair cross-section of the community, to due process of law, to equal protection of the laws, and to a reliable sentencing determination under both the federal and state Constitutions.[18]

---

[18] Although defense counsel did not mention *Batson, supra,* 476 U.S. 79, in his motion at trial, reliance on this federal precedent is properly preserved for appeal. (*People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

## a. *Facts*

Defendant made two *Wheeler/Batson* motions. The first motion concerned Prospective Jurors E.H. and A.F. Prospective Juror E.H., an African-American, was a light equipment operator who indicated on his questionnaire that he was "not for the death penalty" and instead believed life imprisonment without the possibility of parole was "fair." In response to voir dire questions from the trial court, however, E.H. affirmed he had no conscientious objections to the death penalty and would not automatically vote for or against it. Outside the hearing of the other prospective jurors, he explained that his oldest son was in prison and had been in prison for eight of the previous 10 years. He said he was unsure of the specific crime his son had committed, but believed it was a gang-related, nonviolent drug offense. The prosecutor unsuccessfully challenged Juror E.H. for cause and used his second peremptory challenge to excuse him.

Prospective Juror A.F., also African-American, reported in his questionnaire that he was a county probation "peace officer" and that he had not formed an opinion on the death penalty. "If it applies[,] then, I don't care one way or the other." He also revealed that once, while riding in a car, the driver had a marijuana cigarette. For the first and last time in his life, Juror A.F. took a puff. They were stopped and cited by police and fined $50. When questioned by the trial court, he clarified that he was a group supervisor for the probation department and not a sworn peace officer. He also affirmed that he had no conscientious objection to the death penalty. The prosecutor later used a peremptory challenge to excuse Juror A.F.

After the prosecutor excused Prospective Juror A.F., defense counsel did not immediately make a *Wheeler/Batson* motion but instead excused a prospective juror himself. He then approached the bench and, out of the hearing of the jury, made a *Wheeler* motion, arguing that Juror A.F. was African-American and that two of the prosecutor's eight peremptory challenges had been against African-American men. Because defense counsel had exercised a peremptory challenge after the prosecutor excused Juror A.F., the trial court ruled that the *Wheeler/Batson* motion was untimely and "as such, I won't even get into the area of whether you have made a prima facie case of such group bias." After some discussion, the trial court changed its mind and ruled defense counsel had failed to make a prima facie showing of group bias. The court explained that Juror E.H. had a son in prison and that Juror E.H.'s general view was against the death penalty. As for Juror A.F., the court noted that he had been detained by police for marijuana use. The court made it clear, however, that it was denying the motion for both untimeliness and because no prima facie showing of group bias had been made. Out of an

abundance of caution and to "protect the record on appeal," the court invited the prosecutor to state his reasons for the excusals, but he declined the invitation.

Defendant made his second *Wheeler/Batson* motion after the prosecutor peremptorily challenged two prospective jurors for the pool of alternate jurors: Prospective Jurors G.A., a Hispanic man, and T.J., apparently an African-American woman. The trial court denied this motion, and neither juror ended up serving on the jury.

b. *Discussion*

 "We presume that 'a prosecutor uses his peremptory challenges in a constitutional manner. [Citation.] The defendant bears the burden to show, prima facie, the presence of purposeful discrimination. [Citation.] If he succeeds, the burden shifts to the prosecutor to show its absence.' [Citation.] In order to establish a prima facie case of group bias, a litigant must raise the issue in a timely fashion, make as complete a record as feasible, establish that the persons excluded are members of a cognizable class, and show a ' "strong likelihood" ' of group rather than individual bias. [Citations.] 'We give great deference to the trial court in distinguishing bona fide reasons from sham excuses.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 421–422 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

 That the now challenged jurors belonged to a cognizable class and that the record is as complete as was feasible are not disputed. Defendant contends, however, that the trial court erred in ruling that his first *Wheeler/Batson* motion was untimely. A motion attacking the use of a peremptory challenge on the basis of group bias must be timely raised. (*People v. Thompson* (1990) 50 Cal.3d 134, 179 [266 Cal.Rptr. 309, 785 P.2d 857]; *Wheeler, supra,* 22 Cal.3d at p. 280.) For example, a *Wheeler/Batson* motion first made after the jury has been sworn and the venire dismissed is untimely. (*People v. Thompson, supra,* at p. 179; *People v. Perez* (1996) 48 Cal.App.4th 1310, 1314 [56 Cal.Rptr.2d 299]; see *People v. McDermott* (2002) 28 Cal.4th 946, 969–970 [123 Cal.Rptr.2d 654, 51 P.3d 874] [*Wheeler* motion was timely where jury was already sworn but selection of alternates continued].)

The jury had not yet been sworn when defendant made his first *Wheeler* motion. Indeed, little time, perhaps no longer than a single minute, had passed between the prosecutor's excusal of Juror A.F. and defense counsel's first raising the *Wheeler* issue. The only intervening events between the prosecutor's excusal of Juror A.F. and counsel making his first *Wheeler* motion were defense counsel exercising a peremptory challenge to excuse

another juror and the prosecutor passing his turn to exercise another challenge. Moreover, this is not a case in which defense counsel had no explanation for his tardiness, explaining: "The reason I exercised a peremptory [challenge] was that I believe for purposes of continuity I was not going to ask that the court reporter continue this trek back and forth here [to the bench], and that I was, by the exercise of one additional peremptory [challenge], it doesn't render my challenge into *Wheeler* untimely per se." Although as a general matter *Wheeler* motions must be timely made, we have located no authority, and the People cite none, holding that such motions must be made, on pain of waiver, immediately upon the exercise of the offending peremptory challenge and before any other challenges have been made. Indeed, the People essentially concede defendant's first *Wheeler* motion was timely. We agree, and find the trial court erred in ruling otherwise.

Before we turn to the merits of defendant's *Wheeler* claim, we address another preliminary issue. Defendant complains the trial court denied his two *Wheeler* motions by applying the wrong legal standard. For example, in summarizing the law before denying the motion, the trial court opined that "from all the circumstances in the case, the defense must show *a strong likelihood* that such persons are being challenged because of their group association rather than because of any specific bias." (Italics added.) Defendant contends that because *Batson* holds a litigant need show only a reasonable "inference" of bias to shift the burden of justification to the opposing party, the trial court held him to too high a standard in ruling he had failed to make a prima facie case. (See *Batson, supra,* 476 U.S. at p. 96.) The "exact test is not critical to our resolution of this case" (*People v. Cleveland* (2004) 32 Cal.4th 704, 732, fn. 5 [11 Cal.Rptr.3d 236, 86 P.3d 302]), because defendant's showing that group bias animated the prosecutor's use of his peremptory challenges was particularly weak. His only showing in support of the first *Wheeler* motion was that the two challenged jurors were both African-American and that two of his eight peremptory challenges were used against African-Americans. This was insufficient to make a prima facie showing under any standard. (See *People v. Farnam* (2002) 28 Cal.4th 107, 136–137 [121 Cal.Rptr.2d 106, 47 P.3d 988].) Clearly, which standard the trial court applied was not dispositive here.[19]

Turning to the merits of defendant's first *Wheeler* motion, we find no reversible error after viewing the record as a whole. "When a trial court denies a motion under *Wheeler, supra,* 22 Cal.3d 258, after finding no prima facie case of group bias, we consider the entire record of voir dire for evidence to support the trial court's ruling. If the record suggests grounds

[19] This issue is currently before the United States Supreme Court. (*Johnson v. California* (2005) 543 U.S. 1042 [160 L.Ed.2d 610, 125 S.Ct. 824] [granting certiorari].)

upon which the prosecutor might reasonably have challenged the prospective jurors in question, we affirm." (*People v. Yeoman, supra*, 31 Cal.4th at p. 116.) We need not in this case merely infer grounds on which the prosecutor might have challenged the jurors, because the trial court made such reasons plain in explaining why it was denying the motion. Juror E.H. had a son in prison, and "the use of peremptory challenges to exclude prospective jurors whose relatives and/or family members have had negative experiences with the criminal justice system is not unconstitutional." (*People v. Douglas* (1995) 36 Cal.App.4th 1681, 1690 [43 Cal.Rptr.2d 129].) In addition, although he later softened his answers in response to the trial court's voir dire, Juror E.H. reported in his questionnaire that he was against the death penalty. It does not violate *Wheeler, supra*, 22 Cal.3d 258, or *Batson, supra*, 476 U.S. 79, to remove a juror who has "unfavorable" views regarding the death penalty. (*People v. McDermott, supra*, 28 Cal.4th at p. 972.)

In contrast to Juror E.H., Juror A.F.'s connection with the criminal justice system was more trivial, having once been detained and cited for possession of marijuana. The trial court mentioned this incident, however, and also noted that Juror A.F. was not entirely candid, initially reporting he was a "peace officer" when he was not. These constitute grounds on which the prosecutor reasonably could have based his peremptory challenge. (*People v. Yeoman, supra*, 31 Cal.4th at p. 116.) Given the weakness of defendant's showing of bias and the existence of plausible, if not overwhelming, grounds on which the prosecutor might have relied to excuse the jurors, we conclude the trial court did not err in denying defendant's first *Wheeler* motion for lack of a prima facie showing of group bias.

Defendant also claims the trial court erred in denying his second *Wheeler* motion regarding Prospective Alternate Jurors G.A. and T.J., but we reject his claim at the threshold. "[Because] no alternate jurors were ever substituted in, . . . it is unnecessary to consider whether any *Wheeler* violation occurred in their selection. Moreover, any *Batson* violation could not possibly have prejudiced the defendant." (*People v. Turner* (1994) 8 Cal.4th 137, 172 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

Having found the trial court did not err by denying defendant's first *Wheeler/Batson* motion and that no prejudice could have resulted from denial of the second motion involving the alternate jurors, we reject defendant's further reliance on boilerplate invocations of various provisions of the state and federal Constitutions. (See *People v. Yeoman, supra*, 31 Cal.4th at p. 118 ["Defendant's unelaborated citations to the Fifth, Sixth and Eight Amendments to the United States Constitution add nothing to his argument"].)

## C. *Trial Issues*

### 1. *Admission of Sun Valley Swap Meet Robbery*

Prior to trial, the prosecutor moved to admit evidence of defendant's participation in the Sun Valley swap meet robbery in 1988. The prosecutor argued the evidence was admissible on the issues of identity, intent, and motive pursuant to Evidence Code section 1101, subdivision (b),[20] because of the striking similarities between the crimes. Thus, he asserted that in both crimes (1) the perpetrators robbed a swap meet; (2) there were three participants, one who grabbed the money, one who stood behind him with a gun, and one in the getaway car; (3) the robbers stole "readily available cash," not merchandise; (4) the robbers used an Uzi-like weapon or machine gun; (5) the weapon was obscured by clothing (in the Sun Valley crime, a coat was draped over the gun; in the San Fernando crime, the shooter wore a long coat to hide the weapon); and (6) the getaway car was owned by either a participant or a friend.

Responding to the prosecutor's motion, defense counsel emphasized the differences between the two crimes. For example, the robbers in the Sun Valley crime broke into a secured area, whereas the San Fernando crime was essentially a "snatch and run." Defense counsel disputed that swap meets were per se a distinctive location for a crime, arguing that robberies are committed wherever money is present, including at swap meets. The prosecutor countered that defendant, knowing he was about to be convicted in the Sun Valley crime, committed the San Fernando robbery in order to provide some money for his girlfriend; thus, the earlier robbery provided a motive for the second one.[21] In addition, the prosecutor argued that because in the Sun Valley crime the security guard had been a key witness against him, when Teal obstructed his getaway in the San Fernando crime defendant was motivated to kill him "as revenge for [the security guard's] testimony . . . and that Mr. Teal was clearly killed to prevent him from testifying based upon the lesson that was learned by [defendant] in the previous robbery."[22]

---

[20] Evidence Code section 1101, subdivision (b) provides in pertinent part that evidence of other crimes is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

[21] After his arrest, defendant told Jude Barrios where he had hidden his share of the loot and told her he wanted her to have it, but to give some to his mother. At the penalty phase, defendant testified he robbed the San Fernando swap meet to provide for his family while he was in prison.

[22] Jude Barrios later testified at trial that defendant told her he shot Teal to prevent him from testifying against him.

The trial court ruled the evidence was admissible and, to the extent defendant was also moving to exclude the evidence under Evidence Code section 352, denied that motion as well. Evidence was then presented showing defendant's guilt of the Sun Valley crime.

Defendant contends the trial court erred by admitting evidence of his participation in the previous Sun Valley swap meet robbery under Evidence Code section 1101, subdivision (b) and that its admission prejudiced him by permitting the jury to conclude he possessed a bad character. We disagree.[23]

■■■ The rules governing the admissibility of evidence of other crimes are well settled. " 'Evidence of the defendant's commission of a crime other than one for which the defendant is then being tried is not admissible to show bad character or predisposition to criminality but it may be admitted to prove some material fact at issue, such as motive or identity. (Evid. Code, § 1101.) Because evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care. [Citation.]' [Citation.] In cases in which the prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense by evidence he had committed uncharged offenses, admissibility 'depends upon proof that the charged and uncharged offenses share distinctive common marks sufficient to raise an inference of identity.' " (*People v. Medina* (1995) 11 Cal.4th 694, 748 [47 Cal.Rptr.2d 165, 906 P.2d 2].) A somewhat lesser degree of similarity is required to show a common plan or scheme and still less similarity is required to show intent. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402–403 [27 Cal.Rptr.2d 646, 867 P.2d 757].) On appeal, we review a trial court's ruling under Evidence Code section 1101 for abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

■■■ As Evidence Code section 1101, subdivision (b) recognizes, that a defendant previously committed a similar crime can be circumstantial evidence tending to prove his identity, intent, and motive in the present crime. Like other circumstantial evidence, admissibility depends on the materiality of the fact sought to be proved, the tendency of the prior crime to prove the material fact, and the existence *vel non* of some other rule requiring exclusion. (*People v. Catlin, supra*, 26 Cal.4th at p. 146.) Defendant placed all

---

[23] Defendant also claims the error "goes beyond statutory error and infringes upon the constitutional right to due process and a fair trial." Assuming without deciding we may reach this constitutional issue in the absence of an objection on that ground (*People v. Champion, supra*, 9 Cal.4th at p. 908, fn. 6), we conclude the state authority defendant cites is inapposite because it does not address the federal constitutional issue (see, e.g., *People v. Moten* (1991) 229 Cal.App.3d 1318 [280 Cal.Rptr. 602]; *People v. Gibson* (1976) 56 Cal.App.3d 119 [128 Cal.Rptr. 302]) and that defendant fails to persuade us the admission of evidence concerning the prior swap meet robbery rendered his trial so fundamentally unfair that it violated his due process rights (see *Estelle v. McGuire* (1991) 502 U.S. 62, 75 [116 L.Ed.2d 385, 112 S.Ct. 475]; *Walters v. Maass* (9th Cir. 1995) 45 F.3d 1355, 1357).

issues in dispute by pleading not guilty. (*Ibid.*)[24] Accordingly, the identity of the person who robbed Pipkin and killed Teal, and that person's intent and motive, were all material facts.

■ The evidence of defendant's participation in the Sun Valley crime also tends to prove these material facts. "For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' " (*People v. Ewoldt, supra*, 7 Cal.4th at p. 403.) Requiring a "highly unusual and distinctive nature [for] both the charged and uncharged offenses virtually eliminates the possibility that anyone other than the defendant committed the charged offense." (*People v. Balcom* (1994) 7 Cal.4th 414, 425 [27 Cal.Rptr.2d 666, 867 P.2d 777].)

Here, defendant and his cohorts victimized the owners or proprietors of swap meets, an unusual venue for such crimes. We disagree with defendant's characterization of a swap meet as just another generic location where money can be found by those willing to transgress the larceny laws. Swap meets are distinctive in that they are large sprawling affairs with less security over cash receipts than might be found in a permanent brick and mortar establishment. Moreover, the crimes here were committed in a distinctive manner. One robber grabbed the cash, not merchandise, while a second stood behind him with an Uzi or machine gun partially obscured by clothing. The third member of the group waited in a car to facilitate a rapid departure. In light of the distinctiveness and unusual nature of these shared characteristics, we conclude the trial court did not abuse its discretion in ruling evidence of the Sun Valley offense would support the inference the same person committed the San Fernando offense.

■ We reach the same conclusion as to the issue of intent. " 'We have long recognized "that if a person acts similarly in similar situations, he probably harbors the same intent in each instance" [citations], and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution.' " (*People v. Gallego* (1990) 52 Cal.3d 115, 171 [276 Cal.Rptr. 679, 802 P.2d 169].) In other words, if defendant intended permanently to deprive the victim of the Sun Valley crime of his money, the jury legitimately could infer he harbored the same intent with

---

[24] We note defendant declined to stipulate that he was one of the robbers (identity) or that he intended permanently to deprive Pipkin of his money (intent).

regard to his actions toward Pipkin. Although defendant argues the intent to deprive was not "significantly" in issue, it nevertheless was part of the prosecution's burden to prove such intent.

Finally, we conclude likewise as to motive. Although defendant argued at trial that motive was not one of the elements of any crime the prosecutor was obliged to prove, evidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable. "Motive is not a matter whose existence the People must prove or whose nonexistence the defense must establish. [Citation.] Nonetheless, '[p]roof of the presence of motive is material as evidence tending to refute or support the presumption of innocence.'" (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017 [80 Cal.Rptr.2d 676].) Because the security guard at the Sun Valley swap meet had provided key prosecution evidence against defendant, the jury could infer that defendant had a motive to eliminate Teal as a witness. Although defendant argued below that Teal was not, in fact, a security guard for the San Fernando swap meet, he could not have known that at the time of the robbery. All defendant saw was that Teal had captured Ayala during the getaway period; for all intents and purposes, Teal must have appeared to defendant as a security guard. On appeal, defendant contends this theory of motive "is completely unfounded and far too speculative to support admission of other crimes evidence." On the contrary, Jude Barrios later testified that defendant told her he killed Teal to eliminate a witness to the crime, indicating the theory was not so speculative as defendant would have us believe.

Accordingly, we find the trial court did not abuse its discretion in admitting the evidence of the Sun Valley swap meet robbery. For the same reasons, we also find the court did not abuse its discretion in denying defendant's motion to exclude this evidence under Evidence Code section 352. Even were we to find the court abused its discretion, however, any error would have been harmless. After Jude Barrios and Christine Zorns testified, there was little doubt on the issue of identity. Moreover, given defendant's actions during the robbery, coupled with the jury's finding that he personally used a firearm to shoot Teal, there would have been little doubt about his intent or motive. Any error in admitting evidence of the Sun Valley swap meet robbery was thus harmless.

### 2. *Use of a Demonstration Weapon*

Defendant claims the trial court erred by allowing the prosecutor to display two Uzi-like weapons as demonstrative evidence when questioning five witnesses. He contends the trial court's decision to permit the display of such demonstrative evidence violated his due process rights to a fair trial and a

reliable penalty verdict and requires a reversal of the convictions under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and "parallel provisions" of the California Constitution because (a) it was impermissible to use demonstrative evidence; (b) the prosecutor did not establish a proper foundation for such display; and (c) the evidence was irrelevant to the robbery, attempted murder, and murder charges. Defendant did not assert these constitutional claims below. (*People v. Sanders* (1995) 11 Cal.4th 475, 510, fn. 3 [46 Cal.Rptr.2d 751, 905 P.2d 420].) Assuming without deciding the issue was properly preserved for appellate review (*People v. Champion, supra*, 9 Cal.4th at p. 908, fn. 6), we find it is meritless.

■■■ "It is entirely proper for a prosecutor to use objects similar to those connected with the commission of a crime for purposes of illustration." (*People v. Barnett, supra*, 17 Cal.4th at p. 1135.) "[D]emonstrative evidence is admissible for the purpose of illustrating and clarifying a witness' testimony" so long as a proper foundation is laid. (*People v. Ham* (1970) 7 Cal.App.3d 768, 780 [86 Cal.Rptr. 906], disapproved on another ground in *People v. Compton* (1971) 6 Cal.3d 55, 60, fn. 3 [98 Cal.Rptr. 217, 490 P.2d 537].) "[I]t is paramount that it be established that the [weapon] was substantially similar to that which it seeks to illustrate." (*People v. Ham, supra*, at p. 780.) We approved of *Ham*'s analysis in *People v. Wiley* (1976) 18 Cal.3d 162, 177 [133 Cal.Rptr. 135, 554 P.2d 881], and noted that once a proper foundation had been laid, "admission was within the sound discretion of the trial court."

*People v. Barnett, supra*, 17 Cal.4th 1044, is illustrative. In that case, two witnesses observed the defendant hook a fishing lure into the victim's back before murdering him. The prosecution did not have the actual lure used by the defendant so he displayed a demonstration lure to the witnesses. Both witnesses described characteristics of the lure before the prosecutor displayed it, and one witness identified similarities and differences between the demonstration lure and the lure actually used by the defendant. The demonstration lure was substantially similar to the actual lure with the only difference being it lacked the feathers the actual lure had. We held the prosecutor's display of a demonstration lure was proper "[b]ecause it was useful for illustrative purposes and had no tendency to evoke an emotional bias against the defendant as an individual" even though the actual lure was used by the defendant to injure and torture the victim before his death. (*Id.* at p. 1136.) We further noted that "the prosecutor did not use deceptive or reprehensible methods of persuasion [citations] in showing the lure to the witnesses and did not try to pass it off as the lure used by the defendant. Commendably, the prosecutor specifically elicited testimony from [one of the witnesses] identifying the difference between the two lures. No misleading impression was created." (*Ibid.*)

In this case, the trial court properly permitted the prosecutor to display a gun similar to defendant's for demonstrative purposes because the actual gun defendant used was never recovered. As a threshold matter, we reject defendant's claim that the prosecutor failed to lay a proper foundation that the gun defendant used was substantially similar to the demonstration Uzi. Although defendant objected on this ground below, the prosecutor established a proper foundation necessary to display the demonstration weapon to witnesses. Based on the prosecution's firearms expert's opinion, the prosecutor asserted the likely weapon was an Uzi. The prosecutor used two different Uzis as demonstrative evidence. One was an open-bolt model, not marked as an exhibit at trial, that could be fired automatically or semiautomatically, and the other was a closed-bolt model, that could be fired only semiautomatically. With respect to each witness, the prosecutor elicited testimony about the witness's recollection of the gun before he displayed the demonstration Uzi.

For example, Dominic Wright testified that defendant's weapon was not a handgun and defendant needed both hands to hold it. Wright particularly indicated that defendant's left palm was face-up, holding the front of the weapon, and his right hand was on the grip and magazine about six inches behind his left hand. After examining the "demonstration" Uzi, Wright testified the barrel was similar to defendant's gun. In like fashion, Ricardo Mireles testified that defendant's gun was a submachine gun and that he held it with both hands, similarly to the way Wright had described. After being shown the "demonstration" Uzi, Mireles testified the barrel was similar to defendant's gun. Thus, the prosecutor laid the proper foundation and established that the demonstration Uzi was substantially similar to the actual gun used by defendant.

Having found the People laid an adequate foundation for the evidence, we turn to defendant's contention that use of the demonstration Uzi was improper because, as it could not be adequately linked to the crime, it was irrelevant. We disagree. The demonstration weapon assisted the jury in understanding the evidence and testimony. Investigators had recovered expended shell casings at the crime scene, as normally expected in a shooting, but also found four live rounds that were previously chambered and identical to the caliber and manufacturer of the expended shell casings. Leticia Calderon testified that she heard defendant's gun make a clicking sound when he pointed it at Judy Adams during the initial confrontation in the parking lot. The prosecution theorized that defendant's gun had probably malfunctioned or jammed, which made a metal-on-metal clicking sound and caused him to manually eject the live rounds later found by the police. The prosecution's firearms expert testified that if an Uzi malfunctions or jams, manual ejection of the bullets would be required. Thus, the demonstration Uzi was relevant in explaining the four live rounds found at the crime scene and the metal-on-metal clicking sound heard by Calderon.

Finally, the prosecutor did not attempt to mislead the jury with the Uzi. Rather, the prosecutor specifically stated the demonstration Uzi was not the actual weapon used by defendant. Upon initial display, the judge immediately repeated to the jury that the weapon was just a demonstration weapon. On these facts, the demonstration Uzi could not have evoked any emotional bias against defendant. (*People v. Barnett, supra,* 17 Cal.4th at p. 1136.)

Finding the prosecution laid a sufficient foundation, that the evidence was relevant, and that the prosecutor did not use the evidence in an inflammatory or misleading way, we find no error.

### 3. *Various Evidentiary Rulings*

#### a. *Adoptive Admissions*

■ Jude Barrios and Christine Zorns testified over defense objection and recounted incriminating comments they had overheard while defendant, Richard Zorns, and Sergio Ayala discussed the crime in the hours following the swap meet robbery and Teal's murder. Defendant contends the admission of this evidence violated the hearsay rule as well as his constitutional rights to due process of law and to confront the witnesses against him. Regarding the hearsay question, we agree with the trial court that the challenged evidence was admissible because it qualified as an adoptive admission. The law is well settled. Evidence Code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." "Under this provision, 'If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' [Citations.] 'For the adoptive admission exception to apply, . . . a direct accusation in so many words is not essential.' (*People v. Fauber* (1992) 2 Cal.4th 792, 852 [9 Cal.Rptr.2d 24, 831 P.2d 249].) 'When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a *tacit* admission of the statements made in his presence.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

Defendant presented no evidence suggesting he did not hear the comments testified to by Barrios and Christine Zorns. Nor is there any suggestion he failed to speak because he was relying on his Fifth Amendment rights. Although, as defendant emphasizes, the witnesses did not specifically attribute each comment to a particular speaker, that is irrelevant on the facts of this case, where defendant heard the comments, had the opportunity to reply, and the comments were made under circumstances that normally would call for a response. Although he claims there was no evidence of his reaction to the comments, his silence may be taken as an adoption of them. We conclude the trial court properly admitted the statements as adoptive admissions excepted from the hearsay rule.

Defendant also contends the admission of this same evidence violated his federal constitutional rights. He did not, however, make a specific objection on constitutional grounds at trial. Assuming without deciding the issue was properly preserved for appellate review (*People v. Champion, supra,* 9 Cal.4th at p. 908, fn. 6), we conclude defendant fails to persuade us the admission of his adoptive admissions rendered his trial so fundamentally unfair that it violated his due process rights. (See *Estelle v. McGuire, supra,* 502 U.S. at p. 75.) In short, we find no constitutional error.[25]

### b. *Barrios's Admission of Perjury*

The prosecutor proposed to have Jude Barrios testify she perjured herself when, in defendant's earlier trial for the Sun Valley swap meet robbery, she

[25] Assuming for argument that defendant preserved the confrontation issue, we further find the evidence from Ayala and Zorns was nevertheless admissible despite the United States Supreme Court's recent decision in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354]. Prior to that case, the Supreme Court had held that an unavailable witness's out-of-court statement against a criminal defendant could be admitted consistent with the confrontation clause if it bore "adequate 'indicia of reliability.'" (*Ohio v. Roberts* (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 100 S.Ct. 2531].) To qualify under that test, evidence had either to fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." (*Ibid.*) After *Crawford,* it is important to distinguish between hearsay statements that are testimonial and those that are not. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." (*Crawford v. Washington, supra,* 541 U.S. at pp. 68–69 [158 L.Ed.2d at p. 203].) Where an offered statement is nontestimonial, states may regulate the admission of evidence by applying their hearsay rules without running afoul of the confrontation clause. (*Ibid.*)

While the precise contours of the category of "testimonial" statements remain unclear, the statements at issue here do not implicate the constitutional concerns in *Crawford.* Because the statements were adopted by defendant, they become, in effect, his statements, and, "[b]eing deemed the defendant's own admissions, we are no longer concerned with the veracity or credibility of the original declarant." (*People v. Silva* (1988) 45 Cal.3d 604, 624 [247 Cal.Rptr. 573, 754 P.2d 1070]; see *People v. Combs* (2004) 34 Cal.4th 821, 842–843 [22 Cal.Rptr.3d 61, 101 P.3d 1007].) In sum, admission of defendant's adoptive admissions did not violate the confrontation clause as interpreted in *Crawford v. Washington.*

provided him with an alibi. Defendant objected, claiming lack of relevance. The court overruled the objection, noting that "[a] witness's credibility is always in issue." Barrios thereafter testified that she had provided defendant with an alibi, that she had lied when she did so, and that she and defendant had discussed her testimony in the prior case before she testified. She had committed perjury because she loved him and thought she could help him.

Defendant admits evidence of a witness's credibility is generally admissible, but contends "the real purpose for the prosecutor's eliciting this evidence was to prejudice the defendant by showing his involvement in another crime—aiding and abetting perjury—and attack his character." (See Evid. Code, § 1101.) He did not object on this ground and therefore forfeited the issue for appeal. Even had he preserved the claim, it lacks merit. As noted, *ante*, the trial court admitted evidence of defendant's role in the earlier Sun Valley swap meet robbery. Barrios's testimony, especially that she had discussed with defendant what she should say when testifying to provide him a false alibi, was relevant to show defendant's consciousness of guilt for that crime. This evidence was clearly relevant for that purpose and therefore properly admitted.

### c. *Admission of Photographs of Roland Teal*

The jury was not allowed to view postmortem photographs of victim Roland Teal while the witnesses were testifying, but near the end of the prosecution's presentation of guilt phase evidence, the trial court considered whether to admit four photographs. The first shows the nude body of the victim lying on the coroner's table, covered by a towel. The other three photographs portrayed close-up views of the wounds the victim suffered. Defendant objected to their admission; the trial court took the basis of the objection to be that the evidence was more prejudicial than probative. (Evid. Code, § 352.) As to the latter three, the court ruled they were "basically clinical photos. They are not gruesome. They are not bloody." Moreover, "[t]hey are relevant to show the nature of the wounds, the position of the . . . victim in receiving the wounds, and helps illustrate the coroner's testimony." The court concluded these photographs were not more prejudicial than probative and admitted them.

The trial court initially made a different ruling as to the first photograph, which showed the victim on the coroner's table. The trial court stated it saw no relevance to the photo and thus excluded it. The prosecutor argued that the photograph was relevant to an issue raised by the coroner's testimony. Specifically, it was the prosecutor's theory that the victim was shot while his arms were raised (as if to give himself up), although defendant, in his cross-examination of the coroner, raised the possibility the victim was

engaging in certain body gyrations when shot, thereby explaining the particular type of wounds. The prosecutor argued the photo, showing that the victim was an overweight elderly man, was relevant to whether the victim was capable of engaging in such gyrations. The trial court agreed, reconsidered its ruling, and admitted the photograph.

■ Defendant contends the trial court erred when it overruled his objections to the admission of these photographs. The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion. (*People v. Scheid* (1997) 16 Cal.4th 1, 13–14 [65 Cal. Rptr. 2d 348, 939 P.2d 748].) "A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value." (*People v. Gurule, supra*, 28 Cal.4th at p. 624.)

■ We have examined the photographs in question and conclude the trial court did not abuse its discretion. They are not unduly bloody or gruesome and are relevant to the manner in which the victim was killed. As we have previously noted, " 'murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant.' " (*People v. Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].) Although defendant argues the photographs were cumulative to the coroner's detailed testimony, this fact, even if true, does not demonstrate the trial court abused its broad discretion. "[P]rosecutors, it must be remembered, are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case." (*People v. Gurule, supra*, 28 Cal.4th at p. 624.)

### d. *Pipkin's Testimony as to a Lack of Prior Robberies*

The prosecutor asked Barney Pipkin, the manager of the San Fernando swap meet, whether he had ever been robbed before while loading his car with the proceeds from the swap meet. He answered in the negative, whereupon defendant objected on the ground of relevance. The trial court overruled the objection, merely saying: "The answer is in." Defendant contends the information was irrelevant and encouraged the jurors to feel sympathy for Pipkin. Respondent argues defendant waived the issue by failing to request the witness's answer be stricken. We need not resolve either of these contentions, for the issue is too trivial. Even assuming the answer was irrelevant, no conceivable prejudice could have resulted.

### e. *Judy Adams's Call to Police*

Judy Adams called the police when she realized a robbery was occurring. While she was on the phone, she did not see what was happening but relayed

to the police a description of the events provided to her by her son, Rod Adams, and Leticia Calderon, both of whom were percipient witnesses. Police taped this call, and the prosecutor proposed to play the tape for the jury. Defendant objected on the ground the tape contained hearsay, but the trial court overruled the objection. The tape was then played for the jury.

 Defendant contends the trial court erred by permitting the prosecution to play the tape for the jury, arguing that Judy Adams was not a percipient witness and her comments therefore did not qualify as a spontaneous utterance that could fall under an exception to the hearsay rule. Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." In a multiple, nested hearsay situation as here, the multiple hearsay is admissible only "if each hearsay layer separately meets the requirements of a hearsay exception." (*People v. Arias* (1996) 13 Cal.4th 92, 149 [51 Cal.Rptr.2d 770, 913 P.2d 980].) A trial court's decision to admit evidence under the spontaneous utterance exception to the hearsay rule will not be reversed unless the court abused its discretion. (*People v. Phillips* (2000) 22 Cal.4th 226, 236 [92 Cal.Rptr.2d 58, 991 P.2d 145].)

That all three people involved—Judy Adams, her son Rod Adams, and Leticia Calderon—were operating under the stress and excitement of the robbery when the tape was made is not questioned. The crime had just occurred and was ongoing; the robbers were fleeing with the loot, and Roland Teal, Barney Pipkin, and others were in hot pursuit. Although defendant is correct that Judy Adams was not a percipient witness to the events she related to police on the telephone, she was a witness to what the others (Rod Adams and Leticia Calderon) were saying. (*People v. Arias, supra*, 13 Cal.4th at p. 150 [the "act" or "event" described can be another's statement].) Rod Adams and Leticia Calderon, in turn, were percipient witnesses to the unfolding events of the robbery and the flight therefrom. Because both levels of hearsay qualified under the spontaneous utterance exception to the hearsay rule, the trial court did not abuse its discretion by admitting the tape.[26]

---

[26] Defendant did not object at trial on constitutional confrontation grounds and, although he mentions the confrontation clause in his briefing before this court, he does not argue the tape of Judy Adams's telephone call to police was inadmissible under *Crawford v. Washington, supra*, 541 U.S. 36. Nevertheless, assuming this claim is properly before us despite the absence of a timely objection on constitutional grounds, we conclude any possible confrontation problem was avoided by the fact that Leticia Calderon testified at trial. Thus, defendant was able to cross-examine Calderon, the percipient witness, as well as Judy Adams, the conduit of the information to police. To the extent some part of the tape recording of Judy Adams's call to

### 4. *Failure to Instruct on Voluntary Intoxication*

Defendant contends the trial court erred by denying his request to instruct the jury on the effect on his mental state of his alleged voluntary intoxication. He also claims the court's refusal to instruct on intoxication deprived him of his federal constitutional rights to due process of law, to a properly instructed jury, to a fair trial, and to a nonarbitrary capital sentencing process. (U.S. Const., 6th, 8th & 14th Amends.)[27] Because only minimal and insubstantial evidence supported an intoxication defense, the trial court properly refused the requested instruction.

■■■ "[T]he trial court normally must, even in the absence of a request, instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." (*People v. Carter* (2003) 30 Cal.4th 1166, 1219 [135 Cal.Rptr.2d 553, 70 P.3d 981].) In addition, "a defendant has a right to an instruction that pinpoints the theory of the defense [citations]; however, a trial judge must only give those instructions which are supported by substantial evidence. [Citations.] Further, a trial judge has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence." (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386 [42 Cal.Rptr.2d 422, 52 Cal.Rptr.2d 422].) "A party is not entitled to an instruction on a theory for which there is no supporting evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 868 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

■■■ Evidence of voluntary intoxication, formerly admissible on the issue of diminished capacity (see generally *People v. Mendoza* (1998) 18 Cal.4th 1114, 1125 [77 Cal.Rptr.2d 428, 959 P.2d 735]), now is "admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 22, subd. (b); see *People v. Mendoza, supra,* at p. 1126.) Accordingly, a defendant is entitled to an instruction on voluntary intoxication "only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.'" (*People v. Williams* (1997) 16 Cal.4th 635, 677 [66 Cal.Rptr.2d 573, 941 P.2d 752].)

Very little evidence suggested defendant was intoxicated when he robbed Pipkin and killed Teal, and there was no evidence of the effect, if any, such alleged intoxication had on defendant. (*People v. Ivans* (1992) 2 Cal.App.4th 1654, 1661 [4 Cal.Rptr.2d 66] [intoxication instruction not required "unless

---

police was attributable to the out-of-court statements of Rod Adams, any error was harmless beyond a reasonable doubt in light of Calderon's testimony.

[27] Defendant does not rely on any state constitutional ground for this issue.

the evidence *also* shows he became intoxicated to the point he failed to form the requisite intent"].) Defendant relies on the testimony of Jude Barrios, but her testimony fails to provide substantial evidence of intoxication. For example, she testified that Sergio Ayala was intoxicated at the time of the crime and that, due to his heavy drinking, he felt sick after fleeing the scene of the robbery. That information does not establish that defendant also was drinking. Defendant attempts to link Ayala's drinking with himself, noting that Barrios testified defendant told her "they" had been drinking (meaning he, Ayala, and Zorns) in order to build up their courage before committing the robbery. However, she also testified: "I don't know if that meant everybody, but he said they had been drinking." She later clarified her testimony, saying defendant never told her he personally had been drinking. "He said he felt a little woozy, but that was the extent of it. He didn't say he was drinking or anything." This evidence is inadequate to support an intoxication instruction. Nor does evidence that defendant was a habitual user of marijuana constitute substantial evidence he was intoxicated or under the influence *at the time* of the crime. Further, testimony that a few hours *after* the crime defendant was "ecstatic" and on "cloud nine" does not establish he was intoxicated at the time of the crime.

Because the evidence defendant was intoxicated at the time of the crime was "at most minimal" (*People v. Williams* (1988) 45 Cal.3d 1268, 1312 [248 Cal.Rptr. 834, 756 P.2d 221]), the trial court properly refused the defense request to instruct the jury that his alleged voluntary intoxication precluded him from forming the specific intent to kill or to rob. The jury having been properly instructed on this point, we also reject defendant's claims of constitutional error.

### 5. *Failure to Instruct on Manslaughter*

Defense counsel requested that the trial court give a manslaughter instruction based on a theory the gun discharged by accident or mistake. He did not elaborate. The trial court denied the request, saying: "There's no evidence here to warrant the instructions of voluntary manslaughter as to accident and misfortune." The court also explained that a theory of accident or mistake "wouldn't apply in this case under the theory of [the] crime," apparently a reference to the felony-murder rule. Changing theories on appeal, defendant now contends that, due to his intoxication, the trial court should have instructed on both voluntary and involuntary manslaughter as lesser included offenses. The court's failure to instruct on manslaughter, he claims, deprived him of his federal constitutional rights to due process of law, to a properly

instructed jury, to a fair trial, and to a nonarbitrary capital sentencing process. (U.S. Const., 6th, 8th & 14th Amends.)[28] We disagree.

 "The trial court must instruct on lesser offenses necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser. [Citation.] On the other hand, if there is no proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged, such instructions shall not be given." (*People v. Kraft* (2000) 23 Cal.4th 978, 1063 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Defendant contends he was entitled to an instruction on *voluntary* manslaughter because his intoxication "affect[ed] or reduc[ed] the intent to steal necessary for a robbery conviction, [which was] the underlying felony in the felony-murder theory." This same evidence of his alleged intoxication, he claims, required the court to instruct the jury on *involuntary* manslaughter because it showed he was unconscious at the time of the crime. These claims are meritless. The evidence that, at the time of the murder and robbery, defendant was intoxicated was meager. There was absolutely no evidence he had, at the time of the crime, been so intoxicated that he was unable to form the basic mental intent to commit a robbery, or was rendered unconscious. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009 [108 Cal.Rptr.2d 291, 25 P.3d 519].) We conclude the trial court properly refused to instruct on either voluntary or involuntary manslaughter and did not violate defendant's constitutional rights thereby.

### 6. *Defendant's Exclusion from Proceedings*

Defendant contends the trial court violated his constitutional rights under both the state and federal Constitutions to be present at all meaningful proceedings in his trial.[29] In particular, he identifies certain in camera hearings held both before and during trial in which defense counsel (in the absence of both defendant and the prosecutor) declared a conflict due to defendant's threats of violence; other hearings at which counsel, the trial court, and the prosecutor discussed defendant's threats; and a hearing at which defense counsel discussed the possibility of defense counsel's testifying at the penalty phase of the trial.

 "A criminal defendant's federal constitutional right to be present at trial, largely rooted in the confrontation clause of the Sixth Amendment, also enjoys protection through the due process clause of the Fifth and Fourteenth Amendments [citation] ' "whenever his presence has a relation, reasonably

---

[28] As before, defendant does not rely on the state Constitution for this claim.

[29] Respondent's claim that defendant does not rely on the California Constitution for this contention is incorrect. Respondent is correct, however, that defendant does not assert his absence from certain hearings violated any state statutes. (See *People v. Weaver, supra,* 26 Cal.4th at pp. 967–968 [discussing statutory basis for the claim].)

substantial, to the fulness of his opportunity to defend against the charge," '
but not ' "when presence would be useless, or the benefit but a shadow." ' "
(*People v. Ochoa* (2001) 26 Cal.4th 398, 433 [110 Cal.Rptr.2d 324, 28 P.3d
78].) "[A] criminal defendant does not have a right to be personally present at
a particular proceeding unless he finds himself at a 'stage . . . that is critical
to [the] outcome' and 'his presence would contribute to the fairness of
the procedure.' " (*People v. Waidla, supra,* 22 Cal.4th at p. 742, quoting
*Kentucky v. Stincer* (1987) 482 U.S. 730, 745 [96 L.Ed.2d 631, 107 S.Ct.
2658].) "Article I, section 15 of the California Constitution applies the same
standard." (*People v. Ochoa, supra,* 26 Cal.4th at p. 433.)

All of the identified hearings were conducted outside the presence of the
jury and in some manner concerned defendant's threats to harm his counsel
and the prosecutor. As to the hearings directly concerning the effect of
defendant's threats against the prosecutor and defense counsel, defendant
argues that, had he been present, he could have explained that he posed no
threat to either man and thus his presence would have increased the fairness
of the hearings or improved his opportunity to defend against the murder and
robbery charges.[30] We disagree. Defendant already had testified he was
merely trying to delay his trial and did not actually intend to harm the
prosecutor. It is doubtful his presence could have added anything to the
hearings; accordingly, his exclusion from them did not diminish the fairness
of the proceedings.

Similarly, defendant was excluded from the hearing on October 13, 1992,
wherein defense counsel discussed the possibility he would testify. But this
hearing was not a critical one, for defendant had been present at hearings on
October 8, 19, and 20, 1992, in which the possibility of counsel's proposed
testimony was openly discussed. In the latter hearing, defendant expressly
waived his attorney-client privilege and acknowledged his ability to prevent
counsel from testifying. Accordingly, we conclude the October 13 hearing did
not bear a " ' " 'reasonably substantial relation to the fullness of his opportu-
nity to defend against the charge.' " ' " (*People v. Bradford* (1997) 15 Cal.4th
1229, 1357 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Because defendant has not
shown the identified hearings were critical to the outcome of the trial, nor that
his exclusion had an impact on the fairness of the proceedings, his absence
from the hearings does not require reversal. (*People v. Waidla, supra,* 22
Cal.4th at p. 742.)[31]

---

[30] Inasmuch as defendant had proclaimed that he wished to fire his counsel and defend
himself in order to ask the jury to convict him of all charges, it is particularly ironic that he
now argues his absence from these hearings somehow undermined his ability to defend
himself.

[31] Defendant argues his absence from these hearings requires reversal, citing *Campbell v.
Rice* (9th Cir. 2002) 302 F.3d 892. Although that case is distinguishable from defendant's case,

### 7. Alleged Prosecutorial Misconduct

Defendant contends that throughout the guilt phase of his trial, the prosecutor "prejudiced the jury, corrupted the evidentiary presentation and rendered the entire proceeding fundamentally unfair" in violation of his rights to a fair trial, to due process of law, to the assistance of counsel, and to a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and to "parallel provisions" of the state Constitution.

■■■ " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199]; *People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204].) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

■■■ "Prosecutors, however, are held to an elevated standard of conduct. 'It is the duty of every member of the bar to "maintain the respect due to the courts" . . . [Citation.] A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.' " (*People v. Hill, supra*, 17 Cal.4th at pp. 819–820.) " 'Prosecutors who engage in rude or intemperate behavior, even in response to provocation by opposing counsel, greatly demean the office they hold and the People in whose name they serve.' " (*Id.* at p. 820.)

Defendant complains the prosecutor had an ex parte contact with the trial court and interfered with the defense case by informing defense counsel that defendant's brother Eric Roldan was a threat to him, apparently causing counsel to experience unnecessary anxiety. In addition, he claims the prosecutor made a number of gratuitous comments throughout the trial indicating he was not approaching the trial with sufficient solemnity. Some examples suffice: When, in questioning Barney Pipkin the prosecutor referred to the

---

we need not decide that question as the Ninth Circuit Court of Appeals has ordered a rehearing en banc, thereby vacating the original decision. (*Campbell v. Rice* (9th Cir. 2004) 386 F.3d 1258.)

shooter as a "gentleman," he added: "And I use gentleman in the loosest sense at this point in time." When cross-examining Maria Murillo, who was an employee at the swap meet, counsel asked her whether she had conferred with the prosecutor before her testimony. She answered: "Yes, he took care of my lunch." The prosecutor then joked: "For the record, your honor, I have Ms. Murillo's lunch right here. I believe it has some milk in it, a banana." In closing argument, the prosecutor described how defendant sat in the courthouse cafeteria waiting for a verdict in his trial for the Sun Valley robbery and remarked to his girlfriend that the newspaper article about his murder of Roland Teal was inaccurate. The prosecutor opined: "Talk about the audacity in that. Talk about kicking the whole system in the teeth."

 " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Hill, supra,* 17 Cal.4th at p. 820.) Although many of the comments defendant now claims were misconduct were trivial, we need not reach the merits of the issue because he failed to object to any of them and thus failed to preserve the claims for appellate review. Were we to reach the merits, we would find no misconduct because the prosecutor's sarcastic comments did not render defendant's trial fundamentally unfair. (*Id.* at p. 819.)

Other claims of alleged misconduct were preserved by a timely objection, but we find none constituted deceptive or reprehensible attempts to persuade the jury. For example, defendant complains the prosecutor asked the victim's son to identify his father from an autopsy photograph and left the allegedly gruesome photograph face-up on the table where the jury could see it. As noted, *ante,* the photographs were admissible. Moreover, the court noted the witness maintained his composure, though defense counsel disagreed. Accordingly, there was no misconduct.

Defendant also claims the prosecutor committed misconduct by having Christine Zorns identify her husband, Richard Zorns, from a photograph of him wearing jail clothes. The trial court correctly ruled there was no error; accordingly, there was no misconduct. "The appearance of a defense witness attired in prison clothes does not . . . adversely affect the presumption of innocence or carry with it the inference that the defendant is a person disposed to commit crimes." (*People v. Froehlig* (1991) 1 Cal.App.4th 260, 264 [1 Cal.Rptr.2d 858], italics omitted.)

Defendant contends the prosecutor fanned the flames of racial prejudice by repeating a witness's description of the suspicious men he saw at the San Fernando swap meet as "cholo types." Defendant objected, explaining: "I

have never seen cholo used as a term that's intended for a compliment."[32] The trial court directed the prosecutor to forgo using the phrase and instead refer to the men as "suspicious persons." The prosecutor complied; hence, any possible prejudice was averted.

We reach the same conclusion with regard to the prosecutor's snide comments when examining Christine Zorns. He asked whether her statement to the San Fernando police was just a "smoke screen." The trial court sustained an objection. He then asked what her husband and defendant were doing on a particular occasion, to which she answered: "Well, they were talking. I am sure when you go with your friends you guys laugh and joke around." The prosecutor responded: "My friends don't go out and kill people." The trial court properly sustained an objection, and the prosecutor did not return to the theme. There was no conceivable prejudice flowing from these isolated and minor incidents. (*People v. Mayfield* (1997) 14 Cal.4th 668, 754 [60 Cal.Rptr.2d 1, 928 P.2d 485].) In sum, we find defendant failed to preserve for appeal most of his claims of prosecutorial misconduct at the guilt phase, and those he did preserve do not rise to the level of reversible error.

## II. PENALTY PHASE

### A. *Facts*

#### 1. *Aggravating Evidence*

Juan Salazar testified that on November 29, 1987, when he was 16 years old, he was seated in a car when a large African-American man approached him and asked for the time. When Salazar looked at his watch, the man grabbed his right wrist and demanded that he relinquish his car keys. When Salazar complied, the man forcibly removed him from the car and got in the driver's seat. Salazar then noticed defendant, at the time 16 years old, get into the passenger seat. The robbers drove away in the car.

On September 4, 1991, Robert Price was in county jail for possession of narcotics when he was stabbed multiple times in the back. He did not see who assaulted him, but guards later found the probable weapon, a nail configured with duct tape, discarded in the yard. Deputy Sheriff David Koss

---

[32] Thus, for example, a "cholo" is defined as "[a] lower class Mexican (often derog[atory])" (3 Oxford English Dict. (2d ed. 1989) p. 159, col. 2), or "a lower-class Mexican or person of Mexican ancestry" (Webster's 3d New Internat. Dict. (2002) p. 393, col. 1), or "a boy or man who is a member of a Chicano street gang" (1 Random House Historical Dict. of American Slang (1994) p. 412, col. 1). A "cholo" is also defined, however, as "a Spanish-American Indian *esp*: an acculturated Quechuan of Peru and Bolivia." (Webster's 3d New Internat. Dict., *supra*, p. 393, col. 1, definition 1.)

observed the assault and identified defendant, with whom he was acquainted, as the attacker. Defendant later made incriminating statements to Deputy Sheriff Janice Munson.

In addition, as described in more detail, *post*, when examined by Dr. Maloney before trial, defendant threatened to gouge the prosecutor's eyes out.

Louise Teal, the victim's widow, testified that they had been married nine years when her husband, Roland Teal, was murdered. She had had four children before marrying the victim and five more children with him. He worked three jobs to support the family, usually beginning at 4:30 a.m. and not coming home until 9:00 or 10:00 at night. Since his death, her family's standard of living had declined. She described her husband as an active member of the Pacoima community: He was a member of the Chamber of Commerce in Pacoima, an honorary mayor of Pacoima, and on Sundays he was a preacher at the Sylmar Juvenile Hall. One year he organized the Pacoima Christmas Parade for the children of the community and convinced merchants to donate food and presents for the needy. Once or twice a week, people would come to his home and he would give them money or food.

Once, when a plane crashed near the swap meet and someone was trapped inside, no one went to help because some power lines had fallen on the plane. Roland Teal alone rescued the man and received a commendation letter for his heroism from the Governor. Louise Teal characterized her husband as a "fantastic" and "very supportive" husband. Her children still talk about their father "constantly." She misses him "just all the time."

### 2. *Mitigating Evidence*

Defendant presented evidence of his family background in mitigation. Edith Yolanda Roldan, defendant's mother, testified he was born in Manhattan. His father was an alcoholic and drug addict who came home only on weekends. He was a violent man and often beat her. The apartment was infested with vermin and had no electricity. To escape that life, Mrs. Roldan moved the family to Pacoima, California, when defendant was between two and four years old. Within six months, she had acquired a boyfriend named Earl, a drug addict, who also beat her. He also hit the children, including defendant. Because she was afraid Earl would harm her children, she sent defendant and two other sons to Puerto Rico to live with their father. Defendant was about seven years old. Around this time, she became an alcoholic.

After defendant went to Puerto Rico, his mother rarely checked on her sons. Defendant returned to Pacoima when he was 10 or 12 years old. He

often skipped school, received poor grades, and completed only the ninth or 10th grade. His mother never spoke to his teachers or counselors and never attended a PTA meeting. Defendant began drinking heavily and using drugs in January 1990, after his best friend was shot and killed.

Albert Roldan, defendant's older brother, testified that his mother told him and his two brothers they were going to Puerto Rico to live with their father. When they arrived, they learned their mother had told their father only two of them were coming, not three. Their father was often absent, abused alcohol frequently, and abandoned them after a few months. They lived in a single house in the jungle with several of their father's relatives. Their uncle Wilfred often whipped them with a horsewhip for punishment. It was clear they were not wanted, but they had nowhere to go. They were in Puerto Rico for four years.

Defendant testified and gave his version of the crime. He did not attempt to shoot Judy Adams; the metal-on-metal clicking sound occurred when he pulled the bolt on the gun back, chambering a bullet. He thought he had emptied the gun of bullets before the crime, but when Ayala bumped into him trying to get away from Teal, the gun went off accidentally. He admitted he fired in the direction of Pipkin's car, but he was just trying to get Pipkin to stop following them. He fired at the ground, but the bullets must have ricocheted. He did not intend to kill Teal. He committed the San Fernando robbery because he expected to be convicted of the Sun Valley robbery and wanted to give his family some money before he went to prison. He admitted he threatened to gouge out the prosecutor's eyes, but never really intended to do so. He merely thought the threat would lead to a postponement of the trial. He also admitted threatening Barrios, but said he was "very desperate" and "wild" because he had been held in isolation in jail. He admitted stabbing Price, but claimed he had been threatened by some large Black inmates who told him he would be "next."

B. *Discussion*

1. *Admission of Confidential Statements to Dr. Maloney: Attorney-client Privilege*

Prior to the penalty phase of trial, the parties held a hearing to discuss the admissibility as aggravating evidence of defendant's threats to kill the prosecutor. Dr. Maloney testified at this hearing that he had warned the prosecutor because "defendant said several things. One, that he wasn't going to trial. Number 2, that he'd do anything he could to keep from going to trial. Number 3, he made multiple negative comments regarding [the prosecutor]; he apparently knew him from another case. He said he fantasized about

hurting him and mentioned gouging or scratching his eyes out." Dr. Maloney considered defendant sufficiently dangerous, and the threat sufficiently serious, that he was required under *Tarasoff v. Regents of University of California, supra,* 17 Cal.3d 425, to warn the prosecutor. The prosecutor argued this evidence was not privileged under either the psychotherapist-patient privilege or the attorney-client privilege. In addition, he argued the evidence revealed a violation of section 422, which prohibits criminal threats, and was thus admissible as aggravating evidence of criminal activity under section 190.3, factor (b). Defense counsel argued the information was privileged and thus inadmissible, but did not otherwise address whether it was proper aggravating evidence. The trial court ruled the evidence was admissible as aggravating evidence. Dr. Maloney later testified that defendant had said he wanted to hurt the prosecutor; specifically, he mentioned gouging the prosecutor's eyes out.

Defendant contends the trial court erred by permitting Dr. Maloney to testify and describe for the jury defendant's threat because that information was inadmissible due to the attorney-client privilege, a ground on which defendant specifically objected. As noted, *ante,* the trial court appointed Dr. Maloney to assist the defense when defendant became extremely depressed and uncommunicative following the prosecution's decision not to accept any plea short of the death penalty. Defendant's comments to Dr. Maloney, a defense expert, were thus privileged under the attorney-client privilege.[33] "The attorney-client privilege is 'a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer.' (Evid. Code, § 954.) That privilege encompasses confidential communications between a client *and experts retained by the defense.*" (*People v. Coddington* (2000) 23 Cal.4th 529, 605 [97 Cal.Rptr.2d 528, 2 P.3d 1081], italics added, overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069 [108 Cal.Rptr.2d 409, 25 P.3d 618]; see Evid. Code, § 952 [defining "confidential communication between client and lawyer" as including information disclosed to "third persons . . . who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted"].) At the time of defendant's trial, "[n]o express exception to the attorney-client privilege exist[ed] for threats of future criminal conduct." (*People v. Clark* (1990) 50 Cal.3d 583, 621 [268 Cal.Rptr. 399, 789 P.2d

---

[33] The statements normally would have been privileged under the psychotherapist-patient privilege but, as the parties recognize, Dr. Maloney was permitted to reveal the threat under the dangerous patient exception as set forth in Evidence Code section 1024. (See *Menendez v. Superior Court* (1992) 3 Cal.4th 435, 449 [11 Cal.Rptr.2d 92, 834 P.2d 786].)

127].)[34] Accordingly, it was error to admit this evidence over defendant's objection.

Although we find error, we also conclude the error was harmless. To be sure, the prosecutor returned to the evidence of the threat again and again, in questioning Dr. Maloney, in cross-examining defendant, and in closing argument. But such repetition was offset by Dr. Maloney's repeated testimony that defendant's comments indicated it was a fantasy and that he merely had "dreams" of hurting people. That defendant made his comments while extremely angry and depressed over his predicament was clear, and that he lacked well-developed skills to cope with life's disappointments could not have escaped the jury's notice. Defendant did not deny he made the threatening statements to Dr. Maloney, but repeatedly denied actually intending to harm the prosecutor, never wavering from his assertion that he was simply desperate to delay his trial. The jury knew defendant was being held in isolation in jail due to his assault on inmate Price, and no evidence was adduced indicating how defendant could have come close to making good on his threat. In sum, the evidence of the threat was likely seen by the jury as foolish talk from a boastful yet desperate young man.

In addition, the jury was presented with other, significant aggravating evidence. Defendant was on bail and awaiting a jury's decision for committing a very similar crime when he robbed Pipkin and killed Teal. Though only 19 years old, he had already led a life of crime and, while in jail awaiting this trial, seriously assaulted another inmate. He had a serious drug and alcohol problem, going so far as to use money Barrios received for their children from county general assistance in order to buy drugs. He even threatened Barrios's family. Finally, the evidence describing his victim's life and the impact of his murder on the victim's surviving family was powerful. Under the circumstances, it is not reasonably possible defendant would have obtained a more favorable penalty phase result had the trial court excluded the evidence of defendant's threat to harm the prosecutor. (*People v. Michaels* (2002) 28 Cal.4th 486, 538 [122 Cal.Rptr.2d 285, 49 P.3d 1032].)

Defendant also contends that, threats to the prosecutor aside, it was also improper to have allowed Dr. Maloney to testify and describe other information learned in confidence, including defendant's drug use, his "statements showing callousness and disregard for others, and a statement that [he] dreamed of hurting other people." This information also was protected by the attorney-client privilege and thus should have been excluded. Evidence of

---

[34] Evidence Code section 956.5 now permits the disclosure of communications, otherwise privileged by the attorney-client privilege, when disclosure "is necessary to prevent a criminal act that the lawyer reasonably believes is likely to result in the death of, or substantial bodily harm to, an individual." (Added by Stats. 1993, ch. 982, § 8, p. 5622.)

defendant's drug use and his casual disregard for the safety and feelings of others, however, was amply demonstrated by other evidence. The cumulative nature of this evidence compared to the strong evidence in aggravation persuades us that Dr. Maloney's recounting of defendant's nonthreatening statements was harmless.

2. *Admission of Defendant's Threat to the Prosecutor: Section 422*

Defendant contends Dr. Maloney's testimony of his threatening comment was erroneously admitted for another reason, i.e., because his "fantasy" that he would maim and kill the prosecutor did not constitute a violation of section 422. Although defendant objected to the admission of this evidence on grounds of privilege, he did not object on the ground that his actions failed to come within the statutory definition of a criminal threat. Accordingly, he failed to preserve this claim for appeal. In any event, as we explained, *ante*, this evidence was improperly admitted because it was inadmissible on attorney-client privilege grounds.

3. *Alleged Conflict of Counsel*

Defendant next claims reversal of the penalty judgment is required because his right to conflict-free counsel was abrogated when his defense attorney testified at the penalty phase. As we explain, relief is unwarranted because defendant waived the conflict.

When the trial court ruled Dr. Maloney could testify about defendant's statements threatening to kill the prosecutor made during a pretrial psychological evaluation, defense counsel raised for the first time the possibility that he himself might testify and describe the circumstances surrounding defendant's statements. Specifically, counsel would testify that at the time defendant made his threats, the prosecution had just refused to accept a plea involving a sentence short of the death penalty. Counsel asserted that on hearing this news, defendant became extremely depressed and angry and for a time stopped talking to counsel entirely. By describing the circumstances surrounding the threats, counsel apparently hoped to convince the jury that defendant had spoken while flushed with anger, disappointment, and fear of the death penalty, but did not actually intend to hurt the prosecutor.

Counsel explained to the trial court that he had discussed the issue with defendant and "I indicated to him that since I am the only lawyer on the case that there is a potential conflict of not only in the eyes of the jury but perhaps a conflict, in fact, if the lawyer is going to be a witness." Counsel concluded: "Mr. Roldan has indicated to me that he may want me to serve as a witness."

At a later hearing, the trial court had defendant execute a waiver to permit his attorney to testify:

"THE COURT: I did state that under the Rules of Professional Conduct, rule 5-210 which stated in subdivision c, 'A member,' meaning a member of the bar, 'shall not act as an advocate before a jury which will hear testimony from the member unless the member has informed written consent of the client.'

"I don't see the need for a written consent here, since we can do this in open court. You did discuss the fact that you may be testifying with the defendant?

"[DEFENSE COUNSEL]: Your Honor, not only have I discussed it with Mr. Roldan. Mr. Gutierrez [another attorney hired to independently advise defendant] in my presence has discussed it with Mr. Roldan and I believe Mr. Roldan is apprised of the entire ramification should his attorney take the witness stand in order to testify as to events surrounding a conversation I had with members of the district attorney's office and what I advised Mr. Roldan based on those conversations.

"THE COURT: All of this is true, Mr. Roldan?

"THE DEFENDANT: Yes, sir.

"THE COURT: And does your attorney have your permission to testify in this case during which time you will be represented by Mr. Gutierrez?

"THE DEFENDANT: Yes, sir.

"THE COURT: All right. That's fine." At a later hearing, the court took an express waiver of defendant's attorney-client privilege. Defense counsel testified shortly thereafter, questioned by Gutierrez.

■ As defendant now observes, it is dangerous for an attorney who represents a client also to testify in the client's case. (*Comden v. Superior Court* (1978) 20 Cal.3d 906, 912 [145 Cal.Rptr. 9, 576 P.2d 971] ["An attorney who attempts to be both advocate and witness impairs his credibility as witness and diminishes his effectiveness as advocate"].) But, as he concedes, a client can waive a conflict arising out of this dual role. We agree with respondent that defendant validly waived any conflict of interest arising from counsel's testimony. Although defendant characterizes the waiver as one limited to his attorney-client privilege, the record clearly belies that characterization. Defense counsel spoke in terms of the potential conflict of having him testify and, after securing Gutierrez to serve as independent counsel to advise defendant, assured the court that Gutierrez had discussed with defendant the "entire ramification should his attorney take the witness stand."

Defendant concurred with this assessment. This was sufficient. " 'A waiver need not be in any particular form, nor is it rendered inadequate simply because all conceivable ramifications are not explained.' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 375 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

▇▇▇ Defendant also contends the trial court abused its discretion in accepting his waiver of the potential conflict. In a somewhat different context, we recently explained that, in order to ensure a fair trial, trial courts have "substantial latitude" to refuse a defendant's offer to waive his attorney's conflict of interest. (*People v. Jones* (2004) 33 Cal.4th 234, 241 [14 Cal.Rptr.3d 579, 91 P.3d 939]; see *Wheat v. United States* (1988) 486 U.S. 153 [100 L.Ed.2d 140, 108 S.Ct. 1692].) "Protection of a defendant's right to loyal counsel is essential. This court has said that trial judges assume the burden of ensuring that their appointments of counsel for indigent defendants do not 'result in a denial of effective counsel because of some possible conflict.' " (*Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 612 [180 Cal.Rptr. 177, 639 P.2d 248].)

▇▇▇ Nevertheless, "that a court *may* refuse to accept a waiver does not mean the court *must* do so." (*People v. Carpenter, supra,* 15 Cal.4th at p. 376.) Defendant fails to persuade that the trial court, presented with a defendant willing to waive his right to unconflicted counsel, and a defense attorney proposing to testify and support defendant's claim that he did not actually intend to harm the prosecutor, and aware that defendant had received independent legal advice, nevertheless abused its discretion by accepting defendant's proffered waiver. That defense counsel's resulting testimony was not as persuasive or focused as defendant would have liked does not undermine the trial court's exercise of discretion, which obviously must be tested by what was known to the court at the time it ruled.

We conclude defendant waived any potential conflict arising out of his attorney's testimony at the penalty phase, and the trial court did not abuse its discretion by accepting the waiver.

### 4. *Response to Juror Question*

After the jury had been deliberating on the issue of penalty for a short time, it sent out a note to the judge, stating: "We would like to have a copy of the four questions asked by the judge of each of the jurors during jury selection." In the presence of defendant, defense counsel, and the prosecutor, the court then read the questions to the jury. Defense counsel made no objection nor did he request the court to follow any other course of conduct. Defendant now contends that by acceding to a jury request to read the questions without inquiring more directly about the reason for the request, the

court "failed in its duty to oversee the jury's penalty-phase decision-making process and violated [his constitutional rights]." We conclude the issue was not preserved for presentation on appeal due to defense counsel's failure to object; in any event, the claim is meritless.

Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

■ When a trial court decides to respond to a jury's note, counsel's silence waives any objection under section 1138. (*People v. Kageler* (1973) 32 Cal.App.3d 738, 746 [108 Cal.Rptr. 235].) "The failure of defendant's counsel to object or move for a mistrial upon the court frankly informing him of the court's action might also be construed to be a tacit approval. Approval of the court's action, even though it might have been a technical violation of section 1138 of the Penal Code, cures any possible error." (*People v. House* (1970) 12 Cal.App.3d 756, 765–766 [90 Cal.Rptr. 831], disapproved on other grounds in *People v. Beagle* (1972) 6 Cal.3d 441, 451–452 [99 Cal.Rptr. 313, 492 P.2d 1].) We reached a similar conclusion in the analogous situation in which the trial court *declined* to respond to a jury's note pursuant to section 1138. (*People v. Boyette, supra,* 29 Cal.4th at p. 430.)

Defendant argues we may reach the issue, citing *People v. Gurule, supra,* 28 Cal.4th 557, and *People v. Litteral* (1978) 79 Cal.App.3d 790 [145 Cal.Rptr. 186], but neither case is on point. In *Gurule,* the trial court declined a jury request for a readback of defense counsel's closing argument "[a]fter conferring with the parties." (*People v. Gurule, supra,* at p. 649, italics added.) Contrary to defendant's claim here, there is no indication the defense attorney in *Gurule* failed to object. We previously have observed that *Litteral* is of doubtful validity because it permitted a defendant to assert what is essentially the jury's right to a readback of testimony. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 505 [117 Cal.Rptr.2d 45, 40 P.3d 754].) In any event, the case is distinguishable, for there the trial court *refused* to read back portions of the trial, although the jury requested the readback. The jury was thus deprived of critical information it desired to make a decision. (*People v. Litteral, supra,* at p. 796.) By contrast, the trial court here reiterated for the jury, as requested, the information it desired.[35] Unlike in *Litteral,* the jury here was not deprived of any information.

---

[35] We reject out of hand defendant's further claim that "the trial court did not give defense counsel a chance to object." The record indicates counsel was present and could have interposed an objection at any time.

Nor is this the type of error an appellate court might reach in the absence of an objection. By declining to object, a defense attorney might believe the additional information is favorable to his or her client. Such is the case here, where the fourth question read to the jury asked whether a juror, "regardless of the evidence, . . . would automatically, and in every case, vote for a verdict of death and never vote for a verdict of life without the possibility of parole." A juror may have appeared to the others as voting for death without considering the evidence. That counsel, for a strategic reason, desired this question be read back to the jury is quite possible. There being the possibility counsel made a considered decision not to object, we should not now give defendant a second bite at the apple.

■ Even assuming for argument we may overlook the absence of an objection, the claim is meritless. Although defendant speaks in terms of jury difficulties and disorientation, and argues "the trial court has no duty to simply acquiesce to the jury's request," he does not explain what type of confusion he believes was evident in the jury's request, what type of probing the court should have done in response, or how the court erred by responding as it did. We have emphasized that interrogating jurors in the middle of their deliberations is a delicate business and courts should take care lest they inadvertently coerce a verdict. "[N]ot every incident involving a juror's conduct requires or warrants further investigation. 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 478 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) We conclude the trial court did not abuse its discretion in failing to further investigate the reason for the jury's request, nor in rereading for the jury the four questions from voir dire.

### 5. *Victim Impact Evidence*

Following the rendering of the guilt phase verdicts on September 29, 1992, the prosecutor moved for permission to present victim impact evidence at the penalty phase despite having failed to provide defendant with notice of such evidence under section 190.3. When the trial court asked why no notice had been given, the prosecutor replied: "I have no excuse, your honor." Defense counsel argued the request was untimely and, if the court intended to permit the prosecution to present such evidence despite the lack of notice, asked for a continuance. The trial court made a tentative ruling that the prosecution's previous notice that it intended to rely, as aggravating evidence, on the "circumstances of [the] present crime," constituted sufficient notice of victim impact evidence. Defense counsel asked that a final decision be put over until October 8, and the court agreed.

On October 8, 1992, defendant moved to exclude victim impact evidence on ex post facto grounds, arguing his crime "preceded the decision by the United States Supreme Court with regard to the admissibility of victim impact testimony." The trial court denied the motion, but granted a further motion for advance disclosure "with some degree of specificity" of the type of evidence the prosecution intended to present. At a subsequent hearing on October 14, the prosecutor moved in limine to admit into evidence numerous plaques and certificates from various cities attesting to the victim's community work and to a heroic act he once performed. Defense counsel objected, again pointing out the prosecution had provided no notice of this evidence. The trial court affirmed its earlier tentative ruling admitting victim impact evidence, but also ruled that the prosecutor could not read the inscriptions on the plaques and certificates. It later clarified it was excluding the plaques and certificates from evidence, as well as a videotape prepared by the victim's widow. The court allowed the jury to see a single photograph of the victim with his nine children. Louise Teal then testified and described her life with the victim and the impact of his killing on her and her children. No other family member testified. In closing argument, the prosecutor emphasized the positive aspects of the victim's life.[36]

■■■ Defendant raises a number of arguments challenging the admission of Louise Teal's testimony. As the parties recognize, "[p]rior to 1991, evidence of a murder's impact on a victim and the victim's family and friends was not admissible in the penalty phase of a capital trial. (*Booth v. Maryland* (1987) 482 U.S. 496, 501–502 [96 L.Ed.2d 440, 107 S.Ct. 2529]; [citation].) The federal high court later reversed itself in *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597] . . . , deciding that '[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question' [citation] and was thus admissible evidence. We have followed the high court's lead [citation] and have also found such victim impact evidence admissible as a circumstance of the crime pursuant to section 190.3, factor (a)." (*People v. Boyette, supra,* 29 Cal.4th at pp. 443–444.)

---

[36] The prosecutor opined: "[A]lso consider Lucky Teal and Lucky Teal's family. You heard testimony from Louise Teal about Mr. Teal, that he was a hero. That he had nine kids. That he worked three jobs from before sunup to after sundown in order to feed and clothe and support his kids as best he could. [¶] You heard how generous he was. That people would come and ask him for money and for food and things like that. [¶] You heard how active he was in the community with the Chamber of Commerce and making sure that deprived kids in Pacoima where the defendant is from had toys for Christmas. [¶] How he would go to Sylmar Juvenile Hall and preach to people. All of those factors can be considered by you in determining the aggravativeness, if that's a word, of his crime."

Defendant first argues admission of the evidence violated his constitutional right against ex post facto[37] laws (U.S. Const., art. I, § 9, cl. 3; Cal. Const., art. I, § 9), because his crime occurred before *Payne v. Tennessee, supra,* 501 U.S. 808, was decided. Accordingly, he claims his case is controlled by the rule set forth in *Booth v. Maryland, supra,* 482 U.S. 496. We recently addressed this claim in *People v. Brown* (2004) 33 Cal.4th 382, 394–395 [15 Cal.Rptr.3d 624, 93 P.3d 244], concluding *Payne* did no more than remove a judicially created obstacle that had withdrawn a type of evidence that could have proved a material fact. Accordingly, applying the rule in *Payne* in a case where the crime preceded that decision does not violate ex post facto principles. Defendant offers no reason to suggest our decision in *People v. Brown* was in error. We thus hold the admission of Louise Teal's testimony did not violate defendant's constitutional right to be free of laws with retrospective application.

Defendant next argues we should better define the boundaries of victim impact evidence and urges us to adopt a rule disallowing evidence of the victim's characteristics that were unknown to his killer at the time of the crime.[38] Such a limitation, he claims, is necessary to ensure such evidence remains relevant to assessing the moral culpability of the offender. (See *People v. Bacigalupo* (1993) 6 Cal.4th 457, 476 [24 Cal.Rptr.2d 808, 862 P.2d 808].) We disagree. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183 [13 Cal.Rptr.3d 34, 89 P.3d 353].)

Defendant next argues the trial court erred by failing to exclude the victim impact evidence on the ground it was overly inflammatory. We have several times noted that victim impact evidence may be deemed inadmissible if it is so inflammatory that it would tend to divert the jury's attention from the task at hand. (See, e.g., *People v. Zapien* (1993) 4 Cal.4th 929, 992 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Defendant did not object on this ground, however, and thus failed to preserve the issue for appellate review. (*Ibid.*) We also reject the claim on the merits: Louise Teal's time on the stand was relatively short and subdued, and no other family member testified. The trial court properly exercised its discretion by excluding the many plaques and certificates bestowed on the victim for community work and individual heroism. By contrast, the jury heard evidence defendant had threatened the

[37] Although the state and federal ex post facto clauses are limitations on legislative action, the judicial branch is limited by the same principle pursuant to the state and federal due process clauses. (*In re Baert* (1988) 205 Cal.App.3d 514, 518 [252 Cal.Rptr. 418].)

[38] In objecting to the testimony, defense counsel stated: "This is a case in which there was a murder committed in the course of a robbery. It is not the type of case in which Mr. Teal was killed because of his standing in the community. I believe that there is sufficient evidence from which a reasonable trier of fact could ascertain that . . . Mr. Teal's status in the community was completely unknown to [defendant]."

life of the prosecutor and stabbed a jail inmate. Evidence from the surviving spouse, though no doubt possessing a strong emotional impact, was not overly inflammatory.

Defendant next contends the admissibility of victim impact evidence renders the California death penalty statute unconstitutionally vague because the admission of such evidence prevents the law from performing the narrowing function necessary to ensure its constitutionality. We recently rejected this precise claim, and nothing defendant presents suggests our conclusion was in error. (*People v. Boyette, supra,* 29 Cal.4th at p. 445, fn. 12.)

Finally, defendant contends the trial court abused its discretion by admitting the victim impact evidence despite the prosecution's failure to provide adequate notice of the evidence. The fourth paragraph of section 190.3 provides the applicable rule and states in pertinent part: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." Defendant was thus entitled to notice of the prosecution's intended aggravating evidence before the cause was called for trial or as soon thereafter as the prosecutor learned of the existence of the evidence. (*People v. Pride* (1992) 3 Cal.4th 195, 258 [10 Cal.Rptr.2d 636, 833 P.2d 643].) The trial court, aware of the holding in *Pride,* ruled that notice of the evidence was timely under section 190.3 because the prosecution had given notice it intended to present the circumstances of the crime as an aggravating factor, and victim impact evidence is considered a part of the circumstances of the offense.

By so ruling, the trial court fell into error. Although we have found "victim impact evidence admissible as a circumstance of the crime pursuant to section 190.3, factor (a)" (*People v. Boyette, supra,* 29 Cal.4th at p. 444), generic, nonspecific notice that the prosecution intends to rely, as an aggravating factor, on the circumstances of the offense (see § 190.3, factor (a)) fails to give adequate notice that it also intends to present victim impact evidence from surviving family members. Nor is the lack of notice excused by the first sentence in paragraph four of section 190.3, which dispenses with notice of "evidence *in proof of* the offense or special circumstances." (Italics added.) Evidence of a murder's impact on surviving family members is not necessary to prove the murder itself or to prove the existence of any special circumstances and thus cannot be "evidence in proof of" either the murder or the special circumstance.

■ Although section 190.3 gives the trial court discretion to determine what type of notice is adequate (*People v. Roberts* (1992) 2 Cal.4th 271, 330 [6 Cal.Rptr.2d 276, 826 P.2d 274]), the record indicates defense counsel had no notice at all that the prosecution intended to present victim impact evidence at the penalty phase. The prosecutor himself did not believe he had complied with section 190.3, admitting he had no excuse for failing to give notice. Moreover, the section 190.3 notice to which the trial court apparently referred merely stated the following: "Please take notice that . . . all documents, exhibits and witnesses attached hereto and incorporated by reference herein . . . may be utilized by the [P]eople for purposes of [aggravation]. [¶] Furthermore, notwithstanding any other possible use as evidence, the [P]eople will also request the use of prior acts of which the defendant . . . was convicted." Attached to this notice were documents evidencing defendant's participation in the Sun Valley swap meet robbery and a transcript of a statement by Sergio Ayala describing the robbery and murder in the present crime. There was no mention of victim impact evidence.[39] Under the circumstances, we conclude the trial court abused its discretion in finding the prosecution had provided adequate notice.

Though we find error, we conclude the lack of notice was harmless. "The purpose of the notice provision is to afford defendant an opportunity to meet the prosecutor's aggravating evidence." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1182 [113 Cal.Rptr.2d 827, 34 P.3d 937].) The prosecutor first raised the prospect of victim impact evidence on September 29, 1992; defense counsel mentioned the possibility of a continuance at that time, but did not renew the issue at a later hearing. The trial court raised the possibility of holding a hearing pursuant to Evidence Code section 402 to obtain more detailed information about the evidence the People intended to present, but counsel apparently was satisfied with the prosecution's cooperation in providing informal disclosure of the evidence. Louise Teal did not testify until October 14, 1992, more than two weeks after the issue of victim impact evidence first arose. Although defense counsel did not receive timely notice of the evidence, he never asked for a continuance in order to meet it (see *People v. Rodrigues, supra*, 8 Cal.4th at p. 1156 [defendant did not ask for continuance]); hence, we may infer he was notified in time to devise a plan how best to confront it effectively (*ibid.* [defendant had 11 days to prepare to meet the evidence for which notice was absent]). Under the circumstances, the trial court's error in finding that the prosecutor's generic notice complied with section 190.3 was harmless.[40]

---

[39] The prosecution also gave notice it intended to use, in aggravation, evidence defendant had attempted to murder jail inmate Price and evidence discovered in a search of his residence.

[40] We also reject defendant's attempt to constitutionalize the issue of notice in this context. This case is distinguishable from *Lankford v. Idaho* (1991) 500 U.S. 110 [114 L.Ed.2d 173, 111 S.Ct. 1723], on which he relies, because unlike the accused in that case, defendant had

Because we find no prejudice, we also reject defendant's further claims that the admission of Louise Teal's testimony violated his state and constitutional rights to confrontation, to due process of law, to a fundamentally fair penalty proceeding, and to a reliable sentencing determination.

### 6. *Defendant's Statements to Deputy Sheriff Munson*

Defendant next contends the trial court violated his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*)) when it admitted evidence regarding two sets of statements he made to Deputy Sheriff Janice Munson that bore on his guilt of stabbing inmate Price in county jail. The now familiar rule in *Miranda* relies on the Fifth Amendment to the federal Constitution to preclude the evidentiary use of statements made pursuant to a custodial interrogation unless the suspect has knowingly and intelligently waived the rights to remain silent and to the presence and assistance of an attorney, the latter provided at state expense for indigent suspects. (See *People v. Storm* (2002) 28 Cal.4th 1007, 1021 [124 Cal.Rptr.2d 110, 52 P.3d 52].) " 'Interrogation' consists of express questioning, or words or actions on the part of the police that 'are reasonably likely to elicit an incriminating response from the suspect.' " (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 993, quoting *Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 100 S.Ct. 1682].) Just as well established, however, is that "[s]tatements volunteered when not in response to an interrogation are admissible against a defendant, even after an initial assertion of the right to remain silent." (*People v. McDaniel* (1976) 16 Cal.3d 156, 172 [127 Cal.Rptr. 467, 545 P.2d 843].)

"An appellate court applies the independent or de novo standard of review, which by its nature is nondeferential, to a trial court's granting or denial of a motion to suppress a statement under *Miranda* insofar as the trial court's underlying decision entails a measurement of the facts against the law." (*People v. Waidla*, *supra*, 22 Cal.4th at p. 730.) Applying this standard, we conclude the trial court correctly found defendant's statements to Deputy Munson were not made in response to interrogation, were instead gratuitously volunteered, and were thus admissible.

In the first set of statements, Deputy Munson testified she had encountered defendant in the food line in county jail and he had addressed her, saying: " 'What's happening, Deputy Munson?' " Recognizing him, she "asked him if he was going to stay out of trouble." He responded: " 'Yeah, it was nothing. I don't know why they are bothering with all this court. I am guilty. I hit that guy in the yard.' " By saying he "hit" someone, defendant used jail

---

sufficient time to prepare to meet the victim impact evidence. (*People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1156 [similarly distinguishing *Lankford*].)

jargon meaning he had stabbed someone. Munson testified defendant appeared "nonchalant. And he just spontaneously said it. I never questioned him about that particular day. I was just inquiring why he was back out [of the high security area]."

In the second set of statements, Deputy Munson testified that that evening or the next day, she was transporting defendant back to a high security area. He asked her why he was being moved, and she replied "it was for his own protection." He responded: " 'It is no big deal. I don't know why. I am probably going to face the death penalty anyway.' " She agreed with the prosecutor that defendant made this statement "just matter of factly." The trial court held neither set of statements was made in response to interrogation, but they were instead volunteered by defendant and thus their admission did not violate *Miranda*. The record amply supports this finding; hence, we conclude the statements were properly admitted into evidence.

Defendant's further argument that the admission of Deputy Munson's testimony violated his Sixth Amendment rights under *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199] was not preserved for appellate review by a timely objection on that ground. (See *People v. Jenkins, supra,* 22 Cal.4th at p. 1007 [reaching the *Massiah* claim although implying it was waived for failure to object].) We also deny it on the merits. "In order to make out the Sixth Amendment claim, defendant had the burden of 'demonstrat[ing] that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.' " (*Ibid.,* quoting *Kuhlmann v. Wilson* (1986) 477 U.S. 436, 459 [91 L.Ed.2d 364, 106 S.Ct. 2616].) Applying independent review, we conclude Deputy Munson did not deliberately elicit defendant's incriminating comments and thus did not violate his *Massiah* rights.[41]

### 7. *Admission of Other Criminal Acts*

Evidence was produced showing defendant had participated in a number of crimes in addition to the robbery of Barney Pipkin and the murder of Roland Teal. He argues such evidence, to be admissible, must meet "constitutionally-mandated indicia of reliability," that the evidence of other crimes did not meet this standard, and that its admission denied him the reliable penalty

---

[41] Defendant argues he was interrogated in a *custodial* setting, noting that county jail is by its nature "custodial" because he was not free to leave. He cites *Mathis v. United States* (1968) 391 U.S. 1 [20 L.Ed.2d 381, 88 S.Ct. 1503] in support. By concluding Deputy Munson did not *interrogate* defendant, we need not decide whether any interrogation that could have occurred was *custodial*. (Cf. *People v. Fradiue* (2000) 80 Cal.App.4th 15, 19–21 [95 Cal.Rptr.2d 1] [holding some additional restraint, over and above mere incarceration, is required before an interrogation is custodial for *Miranda* purposes].)

determination and fundamental fairness the Constitution requires for capital trials. As we explain, he is incorrect.

■ As noted, the prosecution presented evidence that defendant, when he was 16 years old, participated with another man in the 1987 robbery of Juan Salazar by taking his car. Defendant contends that "[a]t best, he was derivatively liable for a robbery" and that a crime "committed while [he] was still a juvenile, hardly serves as a reliable [indicator] of moral culpability." Defendant did not object on these grounds, however, and thus failed to preserve the claim for appellate review. (*People v. Catlin, supra,* 26 Cal.4th at p. 172.) The claim is also meritless. "Although juvenile adjudications do not qualify as prior convictions under section 190.3, factor (c), and may not be admitted during the penalty phase, evidence of juvenile criminal conduct may be considered as an aggravating factor. Prior violent juvenile misconduct, regardless of conviction, may be admitted as evidence of 'criminal activity . . . which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.' (§ 190.3, factor (b) . . . .)" (*People v. Lewis* (2001) 26 Cal.4th 334, 378 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

■ Defendant next challenges the admission of evidence showing he stabbed inmate Price in county jail. He claims this evidence was inadmissible because, although he was charged with attempted murder, the charges were dropped and he was never prosecuted. We have held that unadjudicated violent criminal behavior is admissible under section 190.3, factor (b)[42] and its admission does not violate a capital defendant's constitutional rights. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1054.) We decline to revisit that considered decision. We further find the trial court did not abuse its discretion in admitting this evidence. (*People v. Smithey* (1999) 20 Cal.4th 936, 991 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

Defendant next contends the prosecution was erroneously permitted to elicit evidence of his participation in other gun-related crimes. The prosecutor cross-examined defendant about his familiarity with firearms and whether he had fired other guns before. Defendant testified he once bought a machine gun and fired it in a park. The prosecutor characterized that act as the grossly negligent discharge of a firearm, a felony. Defendant objected, but the trial court correctly ruled that the line of questioning was permissible because, in earlier testimony, defendant had suggested Teal's shooting was an accident; thus, "the People are allowed to inquire into the number of guns, if they are

---

[42] Section 190.3, factor (b) provides: "In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] . . . [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

loaded, and the habit and custom of keeping them loaded or unloaded or negligently loaded." The trial court denied, however, the prosecutor's request that the jury be instructed on the grossly negligent discharge of a firearm as an unadjudicated violent crime under section 190.3, factor (b).

The trial court did not err in overruling defense counsel's objection. (Cf. *People v. Hill* (1995) 34 Cal.App.4th 727, 737 [41 Cal.Rptr.2d 39] [evidence defendant intended to kill victim to eliminate witness of earlier crime admissible to refute claim of accidental shooting in earlier crime].) Moreover, because the trial court did not instruct the jury to consider the gun evidence as aggravating other-crimes evidence under section 190.3, factor (b), nor did the prosecutor urge the jury to consider the evidence as such, even if the trial court erred in admitting the evidence, no conceivable prejudice resulted.

Defendant next argues the trial court erroneously admitted evidence of perjury as aggravating evidence. The matter arose on the prosecutor's cross-examination of defendant, when defendant admitted he had asked his girl-friend Jude Barrios and at least one other person to lie for him in his trial for the Sun Valley swap meet robbery. Defendant contends evidence of perjury was inadmissible because the crime did not involve violence or the threat of violence. (§ 190.3, factor (b).) He did not object, however, and thus failed to preserve the claim for appellate review. (*People v. Riel, supra*, 22 Cal.4th at p. 1207 [claim of improper admission of nonstatutory aggravating evidence forfeited by failure to object].) In addition, the evidence was admissible to impeach his credibility.

In sum, we find that of the cited instances of alleged improper other-crimes evidence, defendant either forfeited the claim by failing to object or the evidence was properly admitted against him.

### 8. *Exclusion of Defendant's Drug Use*

Defendant testified that he used PCP, marijuana, and LSD, and drank heavily. When being questioned by defense counsel, the following exchange occurred:

"Q. [DEFENSE COUNSEL]: When you were using drugs, did it have an effect on your life?

"A. [DEFENDANT]: Yes, definitely.

"Q. [DEFENSE COUNSEL]: How did it [a]ffect your life?

"[THE PROSECUTOR]: I object as calling for an expert opinion that this witness is not qualified to give.

"THE COURT: As formed, I am going to have to sustain that."

Defendant contends that by so ruling, the trial court violated his Eighth Amendment rights and analogous rights under the California Constitution by preventing him from presenting relevant mitigating evidence of his character and background. He claims the trial court's ruling "prevented the jury from learning important mitigating evidence about [defendant]" including "the effect of [defendant's] drug use on his life."

■ We agree the trial court erred by sustaining the prosecutor's objection. Defendant's opinion as to how drug abuse destroyed his young life was undoubtedly relevant and admissible as mitigating evidence and not excludable as improper expert opinion. The exclusion of mitigating evidence "violates the constitutional requirement that a capital defendant must be allowed to present all relevant evidence to demonstrate he deserves a sentence of life rather than death. [Citations.] Exclusion of such evidence . . . does not automatically require reversal, but is instead subject to the standard of review announced in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], that is, the error is reversible unless it is harmless beyond a reasonable doubt." (*People v. Fudge, supra,* 7 Cal.4th at p. 1117; see *Skipper v. South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669].)

Although the trial court erred, any error was harmless because the trial court immediately thereafter overruled follow-up objections and allowed defendant to testify to his memory problems, his using his girlfriend's money to buy drugs, his failure to support his children as a result of his drug habit, and his failure to hold a regular job. He also was allowed to testify that his grades began slipping when he was drinking and that he then stopped going to school altogether. Because defendant was allowed to present the excluded evidence after all, the error was harmless beyond a reasonable doubt.

### 9. *Instruction on Criminal Threats*

As discussed, *ante,* evidence was admitted of defendant's statement to the psychologist that he would like to gouge the prosecutor's eyes out, and the trial court instructed the jury on the elements of the crime of criminal threats under section 422. Defendant complains the trial court's instruction, for two reasons, deprived him of his constitutional rights to due process of law and to a nonarbitrary capital sentencing process. The court delivered this instruction: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which on its face and under the circumstances in which it is

made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, is guilty of a felony." This instruction essentially tracks the wording of section 422 as it read at the time of defendant's trial. (Stats. 1989, ch. 1135, § 1, pp. 4195–4196.)

Defendant first contends the instruction was faulty because it describes the crime as a felony, when it in fact can be punished as either a misdemeanor or a felony. (§ 422.) He is correct the instruction was slightly misleading for that reason. We do not, however, share his further view that this error was prejudicial. He argues that the instruction "inflates the criminality of the act" and that it "suggests that the Legislature considers this type of conduct to be far more serious than many other crimes." To the contrary, we view this error as minimal. Moreover, compared to his crime of robbing the swap meet and killing the unarmed Roland Teal, as well as his long history of criminality, the instructional misstep was clearly harmless under any standard.

Defendant also argues the instruction fails to set out "as a separate and understandable element" the mental state necessary to commit the crime. Instead, he claims, the instruction "lump[s] this crucial intent element in the long stream of verbiage making up the statute." We disagree: " '[t]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification.' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197].) "[I]f the instruction as given is adequate, the trial court is under no obligation to amplify or explain in the absence of a request that it do so." (*People v. Mayfield, supra,* 14 Cal.4th at p. 778.)

Finally, having found no error in the instruction on criminal threats, we reject defendant's further claim that this alleged error, compounded with other errors, resulted in an unfair sentencing process.

### 10. *Failure to Give Proposed Jury Instructions*

Defendant argues the trial court erred by refusing his three proposed special jury instructions for the penalty phase. We disagree. The first proposed instruction stated that a single mitigating factor could support a sentence of life imprisonment. But the jury was instructed that "[i]f any of the mitigating evidence or any aspect of . . . this case arouses in you compassion

for a defendant you may consider this response in deciding the appropriate penalty to impose in this case. You may, *based upon this response alone,* reject death as a penalty." (Italics added.) Of course, a trial court has no duty to give duplicative instructions. (*People v. Gurule, supra,* 28 Cal.4th at p. 659.)

■ Defendant also proposed an instruction informing the jury that a mitigating factor need not be proved beyond a reasonable doubt and can be relied on if supported by substantial evidence. "Instructions should also be refused if they might confuse the jury." (*People v. Gurule, supra,* 28 Cal.4th at p. 659.) As we explained in *People v. Kraft, supra,* 23 Cal.4th at page 1077, the trial court did not err in refusing this potentially misleading instruction because the instruction implies erroneously that aggravating factors must be proved beyond a reasonable doubt.

■ Defendant's third proposed instruction advised the jury that if it had a reasonable doubt as to the appropriate penalty, it must give defendant the benefit of that doubt and vote for life imprisonment. Courts may refuse instructions that incorrectly state the law (*People v. Gurule, supra,* 28 Cal.4th at p. 659), and the trial court properly ruled defendant's third proposed instruction was incorrect because the beyond a reasonable doubt standard does not apply in this context (*People v. Weaver, supra,* 26 Cal.4th at p. 992). Accordingly, we find the trial court did not err in refusing defendant's three proposed special penalty phase instructions.

### 11. *Alleged Prosecutorial Misconduct*

Defendant next argues the prosecutor committed numerous instances of misconduct, violating his rights under the Eighth and Fourteenth Amendments to the federal Constitution. As we explain, we find the identified instances of alleged misconduct trivial, harmless, forfeited for appeal because defense counsel failed to object, or some combination thereof.

(a) <u>Discovery Violations.</u> Defendant first complains the prosecutor attempted to introduce photographs taken from his home without having first disclosed them to defense counsel. Although defense counsel objected, saying he had not previously seen the photos, his real objection was that the photos comprised bad character evidence that was inadmissible in rebuttal because he had not introduced any good character evidence. The court agreed and excluded the photos on that basis. Although defendant complains the court took no further steps to correct the alleged discovery violation, counsel did not move for further sanctions and none were necessary.

A second alleged discovery violation occurred in connection with Louise Teal's testimony, but, as discussed earlier, there was faulty notice but not a failure to permit discovery. The prosecutor apparently disclosed the specifics of the witness's expected testimony in the days preceding her taking the stand, and defense counsel did not object on the ground the prosecutor violated the rules of discovery. Any claim was thus forfeited for appeal.

■■■ (b) Suggesting Defendant Had Committed Other Crimes. For a prosecutor to suggest in questioning that he or she has information outside the record is misconduct. (See *People v. Wagner* (1975) 13 Cal.3d 612, 619 [119 Cal.Rptr. 457, 532 P.2d 105].) When questioning defendant's brother, Albert Roldan, the prosecutor asked him if defendant "was working or was he going out stealing, bringing money home?" The witness answered: "I don't know if he was stealing, but I know he was bringing home some sort of money." Defense counsel objected, but was overruled. The prosecutor did not return to this theme, instead asking the witness about the jobs defendant had held. In light of the evidence defendant had recently committed robberies at the Sun Valley and San Fernando swap meets, this single question, coupled with the witness's equivocal answer, could not have been prejudicial even if error.

When cross-examining defendant, the prosecutor asked him: "Did you ever tell anybody else that you thought about trying to kill me?" The trial court sustained an objection and instructed the jury to "completely disregard it." This single question, followed by the trial court's direct admonishment, could not have been prejudicial even if misconduct.

■■■ (c) Sarcasm. Defendant next cites several instances in which the prosecutor made sarcastic comments or conducted questioning in an argumentative and confrontational manner. " 'It is unprofessional conduct for a prosecutor to engage in behavior or tactics purposefully calculated to irritate or annoy the court or opposing counsel.' " (*People v. Hill, supra,* 17 Cal.4th at p. 832, quoting ABA Project on Stds. for Crim. Justice, Stds. Relating to the Prosecution Function and the Defense Function (Approved Draft 1971), std. 5.2.)

Some comments now challenged met with no objection and were thus not preserved for appellate review. Other comments met with a quick objection, sustained by the trial court, thereby ameliorating any potential harm. While the record shows the prosecutor was heated and at times inappropriately sarcastic, the case falls far short of one, like *People v. Hill, supra,* 17 Cal.4th 800, where the misconduct was so egregious and pervasive that the defendant was denied a fair trial.

(d) <u>Appeals to Passion and Prejudice</u>. Defendant contends the prosecutor improperly appealed to the passion and prejudice of the jury. (*People v. Bradford, supra,* 15 Cal.4th at p. 1379.) The prosecutor twice attempted to elicit from defendant that he had used the money he stole from Pipkin to buy drugs and get high at approximately the same time the Teal family was mourning the death of the victim. Defense counsel's objections to these attempts were sustained, minimizing any harm. In addition, the jury was instructed not to be "influenced by bias nor prejudice against the defendant," that "[s]tatements made by the attorneys during the trial are not evidence," that "[i]f an objection was sustained to a question, do not guess what the answer might have been," and "[d]o not assume to be true any insinuation [in a question] asked a witness. A question is not evidence." We presume the jury followed these instructions.

 (e) <u>Biblical Reference</u>. Defendant next argues the prosecutor committed misconduct by referring to portions of the Bible he asserted conveyed approval of capital punishment. Defendant did not object and thus failed to preserve the issue for appellate review. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1209 [120 Cal.Rptr.2d 477, 47 P.3d 262].) Nor can we say the argument rendered the trial so unfair that we may reach the issue in the absence of an objection, for the prosecutor did not argue the Bible required a death sentence and he immediately proceeded to emphasize the statutory factors in aggravation. Nevertheless, although the issue was forfeited for appeal, we emphasize that for prosecutors to engage in such arguments is "patent misconduct." (*People v. Hill, supra,* 17 Cal.4th at p. 836, fn. 6.) When prosecutors invoke religious rhetoric (see, e.g., *id.* at p. 836 [" 'an eye for an eye, a tooth for a tooth' "]), when they rely on what they purport to be "God's will" (*People v. Navarette* (2003) 30 Cal.4th 458, 514 [133 Cal.Rptr.2d 89, 66 P.3d 1182]), or when they argue based on what they take to be the true meaning of scriptural passages (see *People v. Wash* (1993) 6 Cal.4th 215, 274 [24 Cal.Rptr.2d 421, 861 P.2d 1107] [prosecutor explaining why apparently conflicting statements in the Old and New Testaments do not really conflict]; *Bennett v. Angelone* (4th Cir. 1996) 92 F.3d 1336, 1346 [prosecutor argued commandment "thou shalt not kill" inapplicable to the government]), all to convince a jury to impose the death penalty, they create and encourage an intolerable risk that the jury will abandon logic and reason and instead condemn an offender for reasons having no place in our judicial system (see *People v. Hill, supra,* at p. 837 [religious argument "tends to diminish the jury's personal sense of responsibility for the verdict"]). Such argument also threatens unnecessarily to consume scarce judicial resources, when an otherwise guilty offender must be retried. (See *Sandoval v. Calderon* (9th Cir. 2000) 241 F.3d 765; *State v. Wangberg* (1965) 272 Minn. 204 [136 N.W.2d 853].)

■ (f) <u>Improper Vouching</u>. It is improper argument for a prosecutor to suggest that the jury should accord some weight to the decision of the district attorney's office to seek the death penalty. (*People v. Hardy, supra*, 2 Cal.4th at p. 211 [misconduct to "trad[e] on the prestige of the district attorney's office in an attempt to convince the jury to return a verdict of death"].) The prosecutor may have transgressed this rule, but defendant failed to preserve the claim by objecting. Moreover, the prosecutor's solitary and brief comment could not have been prejudicial.

(g) <u>Viewing Crime from Victim's Perspective</u>. Defendant next contends the prosecutor committed misconduct by asking the jury in closing argument: "You go to swap meets. Would you want to have a person like the defendant, with a gun like this, fighting for his right to get away with the money that he has illegally gotten with the gun like this? [¶] Would you want to be anywhere near that? [¶] How many innocent bystanders would have been killed that day? [¶] How many others would have died?" Although defendant contends asking the jury to view the crime from the victim's point of view is improper, he failed to object and thus forfeited the claim for appeal. Moreover, this was permissible argument at the penalty phase, based on the circumstances of the offense. (*People v. Garceau* (1993) 6 Cal.4th 140, 206 [24 Cal.Rptr.2d 664, 862 P.2d 664]; § 190.3, factor (a).)

Defendant raises a number of other claims based on the prosecutor's closing argument, but we find the arguments were permissible as reasonably based on the evidence adduced at the penalty phase, the instances were too trivial to be characterized as misconduct, the claims were forfeited for lack of an objection, or some combination thereof.

### 12. *Challenges to the Death Penalty Law*

Defendant raises a number of constitutional challenges to this state's death penalty law and to the standard penalty phase jury instructions. We have rejected these claims in previous cases, and defendant does not persuade us our prior opinions were in error. Accordingly, as noted below, we reject these claims.

(a) The penalty phase jury instructions do not fail "to narrow and channel the jury's discretion," nor were they "unnecessarily confusing, and fail[] to properly define the consideration of mitigating factors." (See generally *People v. Boyette, supra*, 29 Cal.4th at pp. 465–467.)

■ (b) The California death penalty law does not violate international law, specifically the International Covenant on Civil and Political Rights. (*People v. Brown, supra*, 33 Cal.4th at pp. 403–404.)

■ (c) The California death penalty law does not fail to narrow the pool of those eligible for the death penalty. (*People v. Weaver*, *supra*, 26 Cal.4th at p. 992.)

■ (d) The California death penalty law is not unconstitutional due to the lack of intercase proportionality review. (*People v. Weaver*, *supra*, 26 Cal.4th at p. 992.)

■ (e) The capital sentencing factors are not vague and "ill-defined." (See generally *People v. Boyette*, *supra*, 29 Cal.4th at pp. 465–467.)

■ (f) The sentencing scheme is not unconstitutional due to an improper allocation of the burden of proof. (*People v. Weaver*, *supra*, 26 Cal.4th at p. 991.)

■ (g) The sentencing scheme, with aggravating and mitigating factors, is not unconstitutionally confusing due to "the unitary nature of the listing." (*People v. Boyette*, *supra*, 29 Cal.4th at p. 466.)

(h) The jury instructions were not flawed for failure to delete inapplicable sentencing factors. (*People v. Williams* (1997) 16 Cal.4th 153, 268 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

(i) The jury instructions were not flawed for failure to "delineate between the aggravating and mitigating circumstances." (*People v. Boyette*, *supra*, 29 Cal.4th at p. 466.)

CONCLUSION

As noted, the trial court made three errors at the penalty phase: (a) The court erred in ruling the prosecutor had complied with section 190.3 with respect to giving defense counsel notice of the victim impact evidence he intended to introduce; (b) the court erroneously sustained an objection to a question asking defendant's opinion how drug and alcohol abuse had detrimentally affected his life; and (c) the court erred in admitting as aggravating evidence defendant's threatening statements, made to Dr. Maloney in a pretrial examination, because those statements were privileged under the attorney-client privilege. The lack of notice of the victim impact evidence was harmless because defendant had more than two weeks to consider the evidence and did not ask for a continuance. The preclusion of defendant's testimony regarding his drug abuse was also harmless because the court later overruled similar objections and permitted defendant to give his opinion. The admission of defendant's threat to kill the prosecutor was the most serious

error, a breach of defendant's attorney-client privilege. In light of the other aggravating evidence, however, including his prior violent robberies, his attempt to kill inmate Price in the county jail, and the victim impact evidence, we find that error was also harmless. Considering the cumulative prejudicial impact of these errors, we also find it is not reasonably possible defendant would have achieved a more favorable penalty judgment in the absence of the errors.

The judgment is affirmed in its entirety.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied June 8, 2005.